The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Robert Eugene LOW,
Defendant-Appellee.

No. 85SA28.

Supreme Court of Colorado,
En Banc.

Feb. 17, 1987.

---

Doug Primavera, Dist. Atty., Cathy Mullens, Deputy Dist. Atty., Alamosa, for plaintiff-appellant.

Miller & Leher, Michael P. Miller, J. Matthew DePetro, Littleton, for defendant-appellee.

ERICKSON, Justice.

This is an appeal by the prosecution on a point of law following the acquittal of defendant Robert Eugene Low in a trial to the court on a charge of assault in the first degree and all lesser included offenses. The trial court found the defendant not guilty because the prosecution did not establish that the defendant had the required specific or general intent necessary to commit assault in the first, second, or third degrees.[1] *See* § 18–3–202 to –204, 8B C.R.S. (1986). The trial court acquitted the defendant because he had consumed an excessive amount of "HOLD" cough drops which caused him to become "temporarily insane" and incapable of formulating either a specific or a general criminal intent.

The prosecution asserts that the trial court erred as a matter of law in considering evidence of the defendant's chemically induced insanity because the defendant did not specially plead at arraignment the defense of insanity as required by section 16–8–103(1), 8A C.R.S. (1986), or the defense of impaired mental condition as required by section 16–8–103.5(1), 8A C.R.S. (1986). It is undisputed that the defendant did not follow the statutory procedure for pleading insanity or the defense of impaired mental condition. We disapprove of

---

1. In Colorado, "all offenses ... in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are declared to be specific intent offenses." § 18–1–501(5), 8B C.R.S. (1986). The crimes of first-degree assault, as defined in section 18–3–202(1)(a), and second-degree assault, as defined in section 18–3–203(1)(a), (b), and (g), are specific intent crimes.

Only those offenses that contain the mental culpability element of "knowingly" or "willfully" are general intent crimes. § 18–1–501(6), 8B C.R.S. (1986). We use the term "general intent" to signify any crime which does not require proof of a specific intent and is not a crime of strict liability.

the trial court's entry of a judgment of acquittal for the reasons set forth in this opinion.[2]

## I.

Defendant Robert Eugene Low was president and general manager of Prime, Inc., a trucking company in Springfield, Missouri. Low and his fourteen-year old stepson Shane Low (Shane), together with several friends from Springfield, Missouri, arranged a hunting trip to Creede, Colorado.

The hunters planned to meet in Creede on Friday, October 14, 1983. On October 13, 1983, Low worked at his trucking company all day, and then he and Shane attended a hunter's safety class that evening so that they could obtain Colorado hunting licenses. After the hunter's safety class, Low drove all night to be in Creede at the agreed time. Low and Shane arrived in Creede at approximately 3:00 p.m. on October 14, and after some delay, located Kim McCowan (Kim), the brother of the victim in this case, and Jerry Roller (Roller), both of whom were friends from Missouri. Kim and Roller led the way up the canyon to the campsite in a four-wheel-drive vehicle, followed by Low and Shane in Low's pickup truck.

On the trip up the mountain road, the defendant became increasingly anxious and apprehensive, and had feelings of unreality. He began to notice that the trees surrounding the road had a particular type of bark that was "soft and unnatural." He was paranoid and questioned his stepson about what was occurring and why he was being "tricked." At approximately the halfway point to the camp, the defendant stopped his pickup truck. When Kim and Roller stopped their truck to make sure everything was all right, Low demanded that all of the individuals kneel in prayer

with him. Kim testified that he had never known Low to be "a religious person," but imagined that the beauty of the wilderness inspired Low to demand the prayer session. Upon concluding the prayer, Low insisted that Roller drive Shane to the campsite in Kim's truck, and that Kim drive Low's truck with Low as a passenger. Kim complied because Low appeared to be tired from his trip from Missouri. During the remainder of the ride to the campsite, the defendant speculated on whether he was alive or dead.

When the parties arrived at the campsite, the defendant, according to the testimony, was convinced that he was dead and had gone to hell. Kim, still believing that the defendant was exhausted, suggested that Low rest in the small cabin at the campsite while the others unload his truck and erect his tent. Low went to the cabin and rested for five or ten minutes. While in the cabin, the defendant concluded that he was a corpse in a mausoleum and that it was necessary to redeem himself in order to get to heaven. He then walked out of the cabin and up a small knoll and, referring to his tent, said, "we're going to bring it up here. We're going to raise the temple here." The other members of the hunting party took Low's tent up the knoll and began to set it up. Low approached A.D. McCowan (Duane or A.D.), who was helping with the tent, and said, "You're the devil, Duane." A.D. made a response relating to Low's ingratitude and Low said, "If you're not the devil, stand up and look me in the eye." A.D. did so, and the confrontation seemingly ended.

Low went down the knoll to his truck while Kim and A.D. continued to set up the tent. He asked for his rifle and told his stepson to get him some shells for the gun. The other hunters realized by this time that

**2.** The defendant was acquitted after the presentation of all the evidence. In a trial to the court, jeopardy attaches after the first witness is sworn. *Jeffrey v. District Court,* 626 P.2d 631 (Colo.1981); *McCoy v. District Court,* 156 Colo. 115, 397 P.2d 733 (1964). *See also* § 18–1–301(1)(a), 8B C.R.S. (1986) (second trial barred by former prosecution for same offense where first prosecution resulted in acquittal). Jeopardy has attached in this case and, because the prosecution appeals pursuant to section 16–12–102(1), 8A C.R.S. (1986), our review is limited to approval or disapproval of the district court's judgment. *See People v. Trujillo,* 731 P.2d 649, 650 n. 1 (Colo.1986).

Low was disturbed in some way and took the rifle from him. The defendant then unbuckled his hunting knife, went to his tent, and stabbed A.D. in the upper back. Low was immediately subdued. His friends testified that Low repeatedly called his tent a temple, and that he was acting in an irrational and "crazy" manner. McCowan suffered serious injuries and was taken to Creede, and from there he was transferred by ambulance to a hospital in Del Norte.

Kim and Shane remained at the campsite to look after Low while the others took A.D. to the hospital. Low tried to stab himself when Kim attempted to take the hunting knife away from him, but Kim obtained the knife after a brief struggle. Low then returned to his truck, removed a can of kerosene from the truck bed, and went into the partially erected tent. He poured kerosene on the floor, sat in a folding chair, and ignited the tent while he was still inside of it. Kim unsuccessfully attempted to get Low out of the burning tent. Convinced that Low was "crazy," Kim grabbed a gun and ammunition and took Shane into the woods to avoid a further confrontation until help arrived. Low left the tent shortly before it was burned completely and fell asleep on the ground. After a short nap, he began questioning what had happened, and then returned to the cabin and lay down. He dozed and awakened from time to time and began feeling sensations of being cold and again questioned whether or not he was in fact dead. When the police arrived and arrested the defendant the next day, he told them that the unreal nightmare was finally over.

The uncontradicted testimony was that the defendant, for several months prior to the attack on A.D. McCowan, had ingested forty to fifty "HOLD" cough drops a day. The defendant's use of the cough drops had developed over the course of five to six months. He initially took the cough drops after developing a lingering cough and cold but continued to take them as a partial substitute for chewing tobacco and in an effort to quit smoking. On his trip to Colorado, the defendant did not sleep and consumed approximately one hundred twenty cough drops within a twenty-four-hour period. Prior to his attack on McCowan, the defendant had never felt any adverse or intoxicating effects from the cough drops.

Dr. Frederick A. Lewis, a psychiatrist, examined the defendant in June 1984, and concluded that Low was not mentally ill at the time of the examination. "HOLD" cough drops contain the drug dextromethorphan hydrobromide. Dr. Lewis stated that Low ingested approximately one gram of dextromethorphan when he consumed twelve packages of the cough drops in the twenty-four hours preceding the attack on McCowan. In Dr. Lewis's opinion, there was very little doubt that the dextromethorphan caused a psychotic disorder known as "organic delusional syndrome" or "toxic psychosis." Symptoms of toxic psychosis include a distorted perception of reality, paranoia, auditory hallucinations, and delusions. From his medical research, the accounts of the incident by the other witnesses, and his examination of the defendant, Dr. Lewis concluded that Low was psychotic and delusional at the time he attacked McCowan. Dr. Lewis testified that Low was incapable of distinguishing right from wrong at the time of the alleged assault, and that Low did not have the ability to formulate the specific intent to commit a criminal act. In his written report, which was admitted into evidence, Dr. Lewis stated:

> There seems to be no doubt that the patient was legally insane at the time he committed the act. At that point in time, he literally and concretely did not know the difference between right and wrong and was unable to adhere to the right. This case comes as close to duplicating "McNaughten" [sic] as any I have ever seen.

Dr. Robert A. Huffaker, chief of the Department of Psychiatry and Forensic Psychiatry at the Colorado State Hospital, was endorsed as a witness by the prosecution and was called at trial by the defendant. He testified that the defendant was

admitted to the State Hospital on October 18, 1983 for a seventy-two-hour evaluation, and that a urinalysis drug test was administered on October 20, 1983. Dr. Huffaker indicated that Low was tested for marijuana, alcohol, cocaine and most other narcotics, and that the test results were negative.[3] He acknowledged that the hospital did not have the facilities to administer specialized tests for dextromethorphan hydrobromide, which at that time was a new drug. Dr. Huffaker reviewed Dr. Lewis's report and said that the "report was excellent and I concur with it wholeheartedly." Dr. Huffaker agreed that Low was suffering from toxic psychosis at the time of the attack on McCowan, and that the defendant was "temporarily insane" at the time he stabbed McCowan.[4]

The defendant entered a plea of not guilty and waived his right to a jury trial. Both the prosecution and the court were advised that the defendant was not entering a plea of not guilty by reason of insanity, sections 16–8–101(1), 16–8–103(1), 8A C.R.S. (1986), and elected not to plead the affirmative defense of impaired mental condition, sections 16–8–102(2.7), 16–8–103.5(1), 8A C.R.S. (1986). The defendant offered to submit to an examination by any certified psychiatrist selected by the prosecution. That offer resulted in the examination of the defendant by Dr. Huffaker at the Colorado State Hospital in Pueblo.

Prior to trial, defense counsel gave a notice of defenses to the court and to the prosecutor. The affirmative defense of involuntary intoxication was raised in the notice. The defense claimed that the warning on the cough drop box did not alert the defendant to the danger of intoxication.[5] The notice also stated that the defense would rely upon the absence of the requisite specific intent to commit the crime of assault in the first degree.

The trial judge, at the close of the case, found that the prosecution proved beyond a reasonable doubt that Low caused serious bodily injury to A.D. McCowan by means of a deadly weapon. In considering whether Low acted with the specific intent required by the first-degree-assault statute, section 18–3–202(1)(a), 8B C.R.S. (1986), the affirmative defense of involuntary intoxication was reviewed by the court. However, the trial judge did not make an explicit finding of involuntary intoxication, impaired mental condition or insanity, but acquitted the defendant because the prosecution "failed to prove an element of the offense or any lesser included offense; namely, the culpability element of mens rea."[6]

3. The urinalysis test was administered within one week of the attack on McCowan. Dr. Huffaker stated that there was a 90% chance of obtaining positive test results for narcotics and marijuana if Low had ingested those substances within the previous week. Dr. Huffaker admitted that the tests for cocaine are "notoriously inaccurate" if a long period of time elapses between the consumption of the drug and the administration of the test.

4. The General Assembly has not made a special provision for "temporary insanity." Temporary insanity relates to insanity at the time of the commission of the offense only, and is therefore included within the general definition of insanity as set forth in section 16–8–101(1), 8A C.R.S. (1986).

5. The cough drops were sold over the counter without a prescription. "HOLD" cough drops had the following warning on the box:

WARNING: If cough persists or is accompanied by high fever, consult a physician promptly. Do not administer to children under six. Keep out of reach of children. **CAUTION:** If you are pregnant or nursing a baby, seek the advice of a health professional before using this product. **NOT HABIT FORMING** Contains 7.5 milligrams of dextromethorphan HBr per lozenge.

6. In the order acquitting Low, the trial court did not specify the statutory offenses that were included within the initial charge of first-degree assault. Because jeopardy has attached, see note 2 supra, it is not necessary to detail every crime that is a lesser included offense of first-degree assault. For the purposes of this opinion, we limit our discussion of the general intent, lesser included offenses in the statutes defining assault in the second and third degrees. The following list is not intended to be exhaustive.

A person commits second-degree assault when, inter alia, "[h]e recklessly causes serious bodily injury to another person by means of a deadly weapon." § 18–3–203(1)(d), 8B C.R.S.

The question before us is whether the failure of the defendant to plead the defense of insanity or impaired mental condition precludes the introduction of evidence of insanity or impaired mental condition to establish the absence of *mens rea.*

## II.

The power to define criminal conduct and to establish the legal components of criminal liability is vested with the General Assembly. *Hendershott v. People,* 653 P.2d 385, 390 (Colo.1982), *cert. denied,* 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983); *People v. Childs,* 199 Colo. 436, 439, 610 P.2d 101, 103 (1980). *See* Colo. Const. art. V, § 1. The legislature is also empowered to formulate principles of criminal responsibility and justification and, within constitutional limitations, to restrict defenses to particular crimes. *People v. Quick,* 713 P.2d 1282, 1287 (Colo.1986); *Hendershott,* 653 P.2d at 391. *See also People v. DelGuidice,* 199 Colo. 41, 46, 606 P.2d 840, 844 (1979); *People ex rel. Terrell v. District Court,* 164 Colo. 437, 441, 435 P.2d 763, 765 (1967). The General Assembly can require certain matters to be raised by a special plea without offending the constitutional rights of the accused. *Leick v. People,* 131 Colo. 353, 281 P.2d 806 (1955); *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109 (1933).

The only disputed factual issue in this case was whether the defendant had the requisite mental culpability to commit first-degree assault or any lesser included offense. It was stipulated that the defendant, with or by means of a hunting knife, a deadly weapon, stabbed A.D. McCowan in the back and inflicted serious bodily injury.

### A. The Affirmative Defense of Intoxication

Intoxication, voluntary or involuntary, is a "disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 18–1–804(4), 8B C.R.S. (1986). Voluntary or self-induced intoxication is "caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body...." § 18–1–804(5), 8B C.R.S. (1986). Involuntary intoxication is intoxication that is not self-induced, *see* § 18–1–804(3), 8B C.R.S. (1986), and by definition occurs when the defendant does not knowingly ingest an intoxicating substance, or ingests a substance not known to be an intoxicant. *See* § 18–1–804(5), 8B C.R.S. (1986); *People v. Turner,* 680 P.2d 1290 (Colo.App.1983).

While the characterization of intoxication as self-induced or involuntary depends on the facts of each case, the legal consequences of voluntary or involuntary intoxication are clear. An involuntarily intoxicated person is not criminally responsible for his conduct if at the time of the alleged offense the defendant "lacks capacity to conform his conduct to the requirements of law." § 18–1–804(3), 8B C.R.S. (1986). Involuntary intoxication is in this respect similar to "temporary insanity" because there is no immoral or blameworthy stigma attached to the condition. *See generally* R. Perkins & R. Boyce, *Criminal Law* 1005 (3d ed. 1982) (involuntary intoxication establishes that the accused's "derangement is without culpability and hence is to be dealt with the same as if it were

(1986). The crime defined in subsection (1)(d) is a lesser included offense of first-degree assault because proof of the elements of first-degree assault necessarily establishes the elements of second-degree assault as defined in subsection (1)(d). The mental state of recklessly is established if a persons acts intentionally or knowingly. § 18–1–503(3), 8B C.R.S. (1986).

Assault in the third degree is committed when an accused "knowingly or recklessly causes bodily injury to another person or with criminal negligence he causes bodily injury to another

person by means of a deadly weapon." § 18–3–204, 8B C.R.S. (1986). The mental states required for third-degree assault—knowingly, recklessly or "with criminal negligence"—are all established if the prosecution proves intentional conduct. § 18–1–503(3), 8B C.R.S. (1986). Bodily injury is established by proof of serious bodily injury. § 18–1–901(3)(p), 8B C.R.S. (1986). Third-degree assault is a lesser included offense of second and first-degree assault. *See People v. Thompson,* 187 Colo. 252, 529 P.2d 1314 (1975).

the result of mental disease or defect." (footnote omitted)); W. LaFave & A. Scott, *Handbook on Criminal Law* § 45, at 347 (involuntary intoxication is "a defense if it puts the defendant in such a state of mind, e.g., so that he does not know the nature and quality of his act or know that his act is wrong, in a jurisdiction which has adopted the M'Naghten test for insanity." (footnote omitted)). The General Assembly thus has made involuntary intoxication a complete defense to all crimes. *See Hendershott v. People*, 653 P.2d 385, 396 n. 10 (Colo.1982), *cert. denied*, 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983).

▇ Voluntary intoxication "may be offered by the defendant when it is relevant to negate the existence of a specific intent if such intent is an element of the crime charged." § 18–1–804(1), 8B C.R.S. (1986). Consequently, evidence of voluntary intoxication constitutes a defense to specific intent crimes, but is incompetent as a defense to general intent crimes. *Id. See also People v. Aragon*, 653 P.2d 715 (Colo. 1982); *People v. Roark*, 643 P.2d 756 (Colo. 1982); *People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840 (1979).

In *People v. Turner*, 680 P.2d 1290 (Colo. App.1983), the court of appeals considered the analogous situation of a defendant who claimed that he became involuntarily intoxicated by mistakenly consuming an overdose of a prescription drug. The defendant testified that he had not been warned that intoxication would result from exceeding the prescribed dosage, and that he believed that the excessive dosages would induce sleep and not intoxication. The court of appeals reversed the trial court's exclusion of evidence relating to drug ingestion because the defendant's testimony provided "sufficient credible evidence to submit the defense [of involuntary intoxication] to the jury." *Turner*, 680 P.2d at 1293.

Low claimed that the manufacturer's warning did not indicate that intoxication

was a possible side effect of ingesting large quantities of the medication, and Low's previous experience with "HOLD" did not alert him to the possibility of intoxication.[7] Expert testimony established that Low's consumption of excessive quantities of dextromethorphan hydrobromide resulted in delusional and psychotic behavior, precluding Low from conforming his conduct to the requirements of law. Had the trial court found as a factual matter that Low was involuntarily intoxicated, assuming the finding was supported by sufficient competent evidence, its judgment of acquittal would have been proper. There are no special pleading requirements for the affirmative defense of involuntary intoxication,[8] and an involuntarily intoxicated defendant is absolved of responsibility for all criminal acts. *See* §§ 18–1–804(3), 18–1–805, 8B C.R.S. (1986); *see also People v. Gallegos*, 628 P.2d 999, 1001–02 (Colo. 1981).

**B. The Affirmative Defense of Insanity.**

Because the trial court did not make a finding of involuntary intoxication, we must resolve this case on grounds of insanity or impaired mental condition. Section 16–8–101, 8A C.R.S. (1986), provides in pertinent part:

(1) The applicable test of insanity shall be, and the jury shall be so instructed: "A person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong with respect to that act is not accountable. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these

---

7. *See* note 5, *supra.*

8. *But cf.* Crim.P. 16(II)(c) ("Subject to constitutional limitations, the trial court may require

that the prosecuting attorney be informed of the nature of any defense which defense counsel intends to use at trial...").

causes the person is accountable to the law." [9]

■ The General Assembly has classified insanity as an affirmative defense, sections 18–1–802, 18–1–805, 8B C.R.S. (1986), and has set forth rules for pleading the defense, sections 16–8–103(1), 8A C.R.S. (1986), 18–1–802, 8B C.R.S. (1986). The insanity defense "may only be raised by a specific plea entered at the time of arraignment; except that the court, for good cause shown, may permit the plea to be entered at any time prior to trial." § 16–8–103(1), 8A C.R.S. (1986). The consequences of failing to plead the insanity defense as required by statute are clear: "Insanity as a defense shall not be an issue in any prosecution unless it" is pleaded at arraignment. § 18–1–802, 8B C.R.S. (1986). *See also* § 16–8–103(1), 8A C.R.S. (1986).[10]

■ A plea of insanity is akin to the common law plea of "confession and avoidance," and admits the commission of the offense but avoids or provides an excuse for criminal responsibility because the accused was insane at the time of the commission of the offense. *See People v. Chavez,* 629 P.2d 1040 (Colo.1981); *Leick v. People,* 136 Colo. 535, 322 P.2d 674, *cert. denied,* 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958); *Boyd v. People,* 108 Colo. 289, 116 P.2d 193 (1941). In this context, an insane person is absolved of

**9.** Between 1951 and 1983, the definition of insanity in Colorado was the "M'Naghten right and wrong" test augmented by the "irresistible impulse" test. *See e.g.,* Ch. 144, sec. 2, § 507(2), 1951 Colo.Sess.Laws 321, 325; § 16–8–101, 8 C.R.S. (1973); *Early v. People,* 142 Colo. 462, 352 P.2d 112, *cert. denied,* 364 U.S. 847, 81 S.Ct. 90, 5 L.Ed.2d 70 (1960); *Castro v. People,* 140 Colo. 493, 346 P.2d 1020 (1959). In 1983, the General Assembly amended the definition of insanity by deleting all references to the irresistible impulse test. Ch. 188, sec. 1, § 16–8–101(1), 1983 Colo. Sess.Laws 672. *See also* Sammons, *Legislative Update,* 12 Colo.Law. 1251, 1252 (1983). Compare Colorado's definition of insanity with Standards for Criminal Justice § 7–6.1 (2d ed. 1986 Supp.):

(a) A person is not responsible for criminal conduct if, at the time of such conduct, and as a result of mental disease or defect, that person was unable to appreciate the wrongfulness of such conduct.

(b) When used as a legal term in this standard *mental disease or defect* refers to:

(i) impairments of mind, whether enduring or transitory; or,

(ii) mental retardation, either of which substantially affected the mental or emotional processes of the defendant at the time of the alleged offense.

**10.** Section 16–8–103(1), 8A C.R.S. (1986), states in pertinent part:

A defendant who does not raise the defense as provided in this section shall not be permitted to rely upon insanity as a defense to the crime charged, *but, when charged with a crime requiring a specific intent as an element thereof, may introduce evidence of his mental condition as bearing upon his capacity to form the required specific intent.*

The emphasized clause (the "mental condition clause") first appeared as an amendment to the insanity pleading statute in 1955. Ch. 118, sec.

1, § 39–8–1(1), 1955 Colo.Sess.Laws 276. The defense of impaired mental condition has been the subject of our case law since at least 1933 when we decided *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109 (1933). The mental condition clause of section 16–8–301(1) and its predecessors was the General Assembly's recognition of the defense now known as impaired mental condition. This fact explains the statutory limitation on the relevance of evidence of mental condition to specific intent crimes. Our early impaired mental condition cases were similarly limited. *See Rupert v. People,* 163 Colo. 219, 429 P.2d 276 (1967); *Russell v. People,* 155 Colo. 422, 395 P.2d 16 (1964); *Berger v. People,* 122 Colo. 367, 224 P.2d 228 (1950); *Battalino v. People,* 118 Colo. 587, 199 P.2d 897 (1948).

As noted in the text, the defense of impaired mental condition was separately codified as an affirmative defense in 1971, *see* Ch. 121, sec. 1, § 40–1–903, 1971 Colo.Sess.Laws 388, 412, and the special pleading rules for the assertion of the defense were promulgated in 1983, Ch. 188, sec. 3, § 16–8–103.5(1), 1983 Colo.Sess.Laws 672, 673.

The defenses of insanity and impaired mental condition concern the same subject matter because both statutes embody principles of criminal responsibility. The statutory provisions concerning the defenses therefore must be construed in *pari materia* to carry out the intent of the General Assembly. *See People v. Cornelison,* 192 Colo. 337, 559 P.2d 1102 (1977). *Cf. Sweaney v. District Court,* 713 P.2d 914 (Colo.1986); *People v. Hamilton,* 666 P.2d 152 (Colo.1983). Given its legislative history, we conclude that the mental condition clause of section 16–8–103(1), 8A C.R.S. (1986), was the first codification of the impaired mental condition defense in Colorado. As such, it has been entirely replaced by the more detailed statutory provisions concerning the affirmative defense of impaired mental condition.

responsibility for all crimes, including those that do not require proof of a *mens rea* element. *See* § 18–1–802, 8B C.R.S. (1986) ("A person who is insane ... is not responsible for his conduct defined as criminal ....") *and* § 18–1–502, 8B C.R.S. (1986) ("If [performance of a voluntary act] is all that is required for commission of a particular offense, or if an offense or some material element thereof does not require a culpable mental state on the part of the actor, the offense is one of 'strict liability'."). *Cf. Standards for Criminal Justice* § 7–6.1 commentary at 7–300 to –302 (2d ed. 1986 Supp.) (criticizing the *"mens rea* view" of insanity, which eliminates mental nonresponsibility (insanity) as an independent exculpatory doctrine and only permits evidence of mental condition to contest the mental culpability element of a crime; elimination of defense of insanity "inhibits if not prevents the exercise of human judgment that has distinguished our criminal law heritage."). If the defendant intends to assert the defense of insanity, the defense must be pleaded at arraignment or, for good cause shown, at any time prior to trial, or it is waived. § 16–8–103(1), 8A C.R.S. (1986).

### C. The Affirmative Defense of Impaired Mental Condition

In our early cases, we acknowledged that evidence of a mental condition short of insanity may preclude a defendant from forming a culpable mental state. In such circumstances, the defendant was entitled to introduce evidence of his impaired mental condition to negate the existence of specific criminal intent, despite the defendant's failure to specially plead the insanity defense.

In *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109 (1933), we stated that a defendant who "is afforded the opportunity ... to raise the question of his irresponsibility by reason of insanity at the time the act was committed, chooses not to do so but interposes only the general plea of not guilty, he cannot, under such plea, claim irresponsibility by reason of insanity, and demand an acquittal thereof." *Id.* at 525, 22 P.2d

at 1112. We went on to hold, however, that the accused is "entitled to introduce evidence of insanity, for the purpose, not of an acquittal, but of reducing the grade of crime...." *Id.*

The distinction between the defenses of insanity and impaired mental condition was explained as follows:

To be guilty of murder of the first degree a person must not only be sane, but in killing he must have acted willfully, deliberately and with premeditation. Whether he so acted is for the jury to determine after a consideration of all the facts and circumstances in evidence, including those affecting his mental condition at the time. A defendant, by reason of his failure to raise the issue of insanity ... may be conclusively presumed to be sane in the sense that he is responsible and amenable to the law, and still, by reason of some · mental derangement—insanity or otherwise—may not have acted with express malice, deliberation or premeditation; and in such case he would not be guilty of first-degree murder; second-degree murder being the highest degree of homicide of which he could be convicted.

*Ingles,* 92 Colo. at 525–26, 22 P.2d at 1112.

Our cases subsequent to *Ingles* consistently adhered to the rule that evidence of defective mental condition was admissible to negate "express malice" or specific criminal intent. *See, e.g., Rupert v. People,* 163 Colo. 219, 429 P.2d 276 (1967); *Russell v. People,* 155 Colo. 422, 395 P.2d 16 (1964); *Berger v. People,* 122 Colo. 367, 224 P.2d 228 (1950); *Battalino v. People,* 118 Colo. 587, 199 P.2d 897 (1948).

The affirmative defense of impaired mental condition was first given separate statutory treatment when the Colorado Criminal Code was enacted in 1971. Ch. 121, sec. 1, § 40–1–903, 1971 Colo.Sess.Laws 388, 412. As originally enacted, the impaired mental condition statute paralleled the early Colorado cases by limiting the defense to specific intent crimes only:

Evidence of an impaired mental condition though not legal insanity may be offered in a proper case as bearing upon the capacity of the accused to form *the specific intent if such an intent is an element of the offense charged.*

§ 40–1–903, 1963 C.R.S. (1971 Perm.Supp.) (emphasis added).

We interpreted the text of the statute in a number of cases, however, and held that the statutory limitation of the affirmative defense of impaired mental condition to specific intent crimes did not, by itself, create an impermissible presumption of culpability for general intent crimes. *See People v. Morgan,* 637 P.2d 338 (Colo. 1981); *People v. Gallegos,* 628 P.2d 999 (Colo.1981); *People v. Fite,* 627 P.2d 761 (Colo.1981); *People v. Ledman,* 622 P.2d 534 (Colo.1981).

In *Hendershott v. People,* 653 P.2d 385 (Colo.1982), *cert. denied,* 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983), we held that the defendant's due process rights were violated when the trial court ruled all evidence of mental impairment inadmissible in a prosecution for third-degree assault, a general intent crime. We interpreted the statute as "a statutory affirmative defense for specific intent crimes rather than, ... a statutory prohibition of mental impairment evidence in all but specific intent offenses." 653 P.2d at 392 n. 5. We concluded that the trial court's limitation of the mental impairment defense to specific intent crimes precluded Hendershott from contesting the *mens rea* element of third-degree assault, which rendered "the prosecution's evidence on that issue uncontestable as a matter of law, in derogation of the presumption of innocence and the constitutional requirement" that the prosecution establish guilt beyond a reasonable doubt. 653 P.2d at 391.[11]

Once we accept the basic principles that an accused is presumed innocent and that he cannot be adjudicated guilty unless the prosecution proves beyond a reasonable doubt the existence of the mental state required for the crime charged, it defies both logic and fundamental fairness to prohibit a defendant from presenting reliable and relevant evidence that, due to a mental impairment beyond his conscious control, he lacked the capacity to entertain the very culpability which is indispensable to his criminal responsibility in the first instance. We therefore disapprove the trial court's ruling as violative of due process of law and hold that reliable and relevant mental impairment evidence is admissible, upon proper foundation, to negate the culpability element of the criminal charge.

*Hendershott,* 653 P.2d at 393–94 (footnote omitted).

The General Assembly amended the definition of impaired mental condition after *Hendershott* was announced. Ch. 188, sec. 2, § 16–8–102(2.7), 1983 Colo.Sess.Laws 672, 673. The new definition does not distinguish between specific and general intent crimes:

"[I]mpaired mental condition" means a condition of mind, caused by mental disease or defect, which does not constitute insanity but, nevertheless, *prevents the person from forming a culpable mental state which is an essential element of a crime charged.*

§ 16–8–102(2.7), 8A C.R.S. (1986) (emphasis added).

 The impaired mental condition defense, which we addressed in *Hendershott,* is separate and distinct from the defense of insanity. The sole effect of the defense of impaired mental condition is to negate the existence of an element of the crime charged. "Mental impairment evi-

---

11. The early cases cited supra at 630 also held that evidence of mental "derangement" short of insanity was inadmissible to contest the element of mental culpability for general intent crimes, or those crimes requiring proof of implied malice. These cases did not address the due process claim raised in *Hendershott v. People,* 653 P.2d 385 (Colo.1982), *cert. denied,* 459 U.S. 1225, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983). To the extent that the decisions are inconsistent with the rule established by *Hendershott,* they have been overruled by that decision.

dence is evidence of a mental disease or defect which affects the defendant's cognitive or volitional faculties to the point of rendering him incapable of entertaining the *mens rea* for the crime charged against him." *Hendershott,* 653 P.2d at 396. *See also* § 16–8–102(2.7), 8A C.R.S. (1986). Thus, unlike the insanity defense, the successful assertion of impaired mental condition negatives the commission of the crime. *Hendershott,* 653 P.2d at 393.

### III.

The defendant argues that evidence of his insanity or impaired mental condition was admissible under the rule of *Hendershott.* We disagree. In *Hendershott,* we reversed the trial court's exclusion of all evidence of mental impairment because the defendant was charged with and prosecuted for a general intent crime. *Hendershott* did not address the ability of the General Assembly to provide special pleading rules for the defenses of justification, exemption, excuse, and responsibility. Indeed, the special pleading rules for the affirmative defense of impaired mental condition were not promulgated until after *Hendershott* was announced. *See* Ch. 188, sec. 3, § 16–8–103.5(1), 1983 Colo.Sess. Laws 672, 673.

 The statutory scheme for raising the defenses of insanity and impaired mental condition is clear. If the defendant intends to avoid responsibility for criminal acts by pleading not guilty by reason of insanity, the plea must be entered at the time of arraignment or at any time prior to trial for good cause shown. § 16–8–103(1), 8A C.R.S. (1986). "Insanity as a defense shall not be an issue in any prosecution unless it is" properly asserted. § 18–1–802, 8B C.R.S. (1986). *See also* § 16–8–103(1), 8A C.R.S. (1986). Consequently, evidence of insanity is irrelevant and inadmissible at a trial on the merits in the absence of a special plea. *See Robbins v. People,* 142 Colo. 254, 350 P.2d 818 (1960); *Mundy v. People,* 105 Colo. 547, 100 P.2d 584 (1940); *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109 (1933).

 The defense of impaired mental condition applies where the defendant intends to contest the commission of the crime due to his alleged inability to formulate the requisite culpable mental state. Impaired mental condition also must be raised at arraignment, or it too is waived. Evidence of impaired mental condition is admissible only if the defense is pleaded as required by statute. §§ 16–8–103.5, 8A C.R.S. (1986), 18–1–803(2), 8B C.R.S. (1986).

 In this case, the trial court's findings and conclusions failed to address the defense of involuntary intoxication which was properly raised and was the primary theory of defense. Evidence of involuntary intoxication was before the trial court but Low's acquittal was not predicated on that defense. Temporary insanity is not part of the Colorado statutory framework for resolving a defendant's nonresponsibility for a criminal act, and was not a proper ground for the trial court's entry of a judgment of acquittal. The trial court permitted Low to introduce evidence of insanity and impaired mental condition to defeat the *mens rea* element of first-degree assault and the lesser included offenses. It is undisputed that Low did not plead the defenses of impaired mental condition or insanity at arraignment. The expert psychiatric testimony adduced at trial was inadmissible insofar as it was offered to prove Low's nonresponsibility due to insanity or inability to formulate specific or general criminal intent due to mental impairment.

Accordingly, the trial court's judgment of acquittal is disapproved.

DUBOFSKY, J., does not participate.