The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 22, 2023

## 2023COA110

**No. 21CA1230, *People v. Mion* — Criminal Law — Affirmative Defenses — Involuntary Intoxication**

In this direct appeal in a criminal case, the defendant contends that the trial court erred by not instructing the jury on his affirmative defense of involuntary intoxication. The defense was based on the defendant's claim that, before he committed the crimes at issue, he smoked a joint that he thought contained only marijuana, but which actually contained a stimulant that deprived him of the capacity to conform his conduct to the requirements of the law.

In an issue of first impression in Colorado, a division of the Colorado Court of Appeals holds that the affirmative defense of involuntary intoxication is legally cognizable when (1) a defendant knowingly ingests what he believes to be a particular intoxicant;

(2) in so doing, he *unknowingly* ingests a different intoxicant; and

(3) it is the different intoxicant that deprives him of the capacity to conform his conduct to the requirements of the law.  Because that was the essence of the defendant's involuntary intoxication claim, his defense was legally cognizable.  The division also holds that the defendant presented sufficient evidence — a low threshold — at trial to entitle him to a jury instruction on involuntary intoxication.  Because the trial court refused the defendant's requested involuntary intoxication instruction, and because the division can't conclude that the error was harmless beyond a reasonable doubt, it reverses the judgment and remands the case for a new trial.

Court of Appeals No. 21CA1230
City and County of Denver District Court No. 19CR6240
Honorable Eric M. Johnson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Isaac U. Mion,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE WELLING
Lipinsky and Gomez, JJ., concur

Announced November 22, 2023

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Joseph Chase, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant

¶ 1     In this direct appeal in a criminal case, defendant, Isaac U. Mion, contends that the trial court erred by not instructing the jury on his affirmative defense of involuntary intoxication.  The defense was based on Mion's claim that, before he committed the crimes at issue, he smoked a joint that he thought contained only marijuana, but which actually contained a stimulant that deprived him of the capacity to conform his conduct to the requirements of the law.

¶ 2     Addressing an issue of first impression in Colorado, we hold that the affirmative defense of involuntary intoxication is legally cognizable when (1) a defendant knowingly ingests what he believes to be a particular intoxicant; (2) in so doing, he *unknowingly* ingests a different intoxicant; and (3) it is the different intoxicant that deprives him of the capacity to conform his conduct to the requirements of the law.  Because that was the essence of Mion's involuntary intoxication claim, his defense was legally cognizable. We also hold that Mion presented sufficient evidence — a low threshold — at trial to entitle him to a jury instruction on involuntary intoxication.  Because the trial court refused Mion's requested involuntary intoxication instruction, and because we

1

can't conclude that the error was harmless beyond a reasonable doubt, we reverse the judgment and remand for a new trial.

## I.  Background

### A.  The Criminal Charges and Events Underlying Them

¶ 3        The prosecution charged Mion with aggravated robbery, criminal mischief, and felony menacing based on events that occurred on a summer night in 2019.

¶ 4        At around 11 p.m. that night, a security guard found Mion sleeping on the grounds of the Denver City and County Building. The guard told Mion that the grounds were closed to the public and that he couldn't sleep there.  The guard returned several minutes later, found Mion still sleeping there, and told Mion he was going to call 911 if Mion wouldn't leave.  Mion then stood up and, while allegedly holding a screwdriver, grabbed the guard's phone out of his hand (the basis for the aggravated robbery charge).  At trial, the security guard described Mion's behavior during the encounter as "agitated" and "erratic."

¶ 5        A second security guard approached and called 911.  Mion knocked her phone out of her hand, causing the screen to crack (the basis for the criminal mischief charge).

2

¶ 6     Mion eventually left the grounds of the City and County Building but later began yelling at a third victim.  When that victim got in his truck, Mion verbally threatened him and hit the truck with a club-like object (the basis for the felony menacing charge).  At trial, that victim described Mion's "rage" and "erratic" behavior during the incident.

¶ 7     Police officers arrested Mion after he tried to evade them by, among other things, submerging himself in a creek.  During the arrest, Mion yelled at the officers to shoot him and that he wanted to die.  At trial, one of the officers testified that he was most concerned about Mion's "really loud, erratic behavior" that evening.

### B.     Mion's Tendered Affirmative Defense of Involuntary Intoxication

¶ 8     Before trial, Mion endorsed the affirmative defense of involuntary intoxication.

¶ 9     Mion testified in his own defense at trial.  According to Mion's testimony, on the evening in question, he was on his way to deliver a bicycle to someone when he stopped to visit a friend who normally stayed in a little doorway in downtown Denver.  Mion commonly visited that friend when he was downtown.

¶ 10    While visiting the friend, Mion drank a "little bit" of malt beer but didn't feel drunk.

¶ 11    Mion's friend also began smoking what looked to Mion like a joint containing marijuana.  Mion assumed it was marijuana with a low THC level, known as "dirt weed," explaining that he "grew up in the '80s" and "if you got weed you got it from Civic Center" and "it was not strong weed ever."  Mion had smoked marijuana at least a couple hundred times, and more recently about ten times per year.  The joint Mion's friend was smoking was very small, which seemed odd to Mion because of the prevalence of marijuana in Denver.

¶ 12    The friend offered the joint to Mion.  Although Mion was "not a fan" of marijuana because it tended to demotivate him, Mion accepted the joint "out of courtesy" because "it's kind of disrespectful if someone who doesn't have a lot offers you something and you don't accept."  Mion didn't ask his friend what was in the joint because he wanted to "portray . . . trust . . . breaking bread with this person out of respect."

¶ 13    Mion took "two hits" from the joint.  To Mion, the joint smelled like marijuana and didn't have a strange taste.

¶ 14     Approximately twenty minutes later, Mion began having "tunnel vision emotionally" and feeling a scary sense of foreboding. He remembered going to the City and County Building, and the last thing he remembered thinking was, "This is all bad." He had no memory of falling asleep at the City and County Building or of any of the events underlying the charges in this case.

¶ 15     Video surveillance presented at trial showed Mion's behavior that evening, which Mion described as being in a "ca[ta]tonic state." When Mion was asked at trial whether marijuana had ever caused that kind of effect on him, he responded, "No. Nothing like that." He further explained that marijuana had never made him "blackout" or "go nuts." He also testified that methamphetamine and cocaine, which he had also used in the past, had never made him "blackout" or "go nuts." Mion testified that if he had thought drinking the beer and smoking two hits from the joint would affect his plans to deliver the bicycle that evening, he wouldn't have done so.

¶ 16     One of the arresting police officers, who had experience dealing with people under the influence of drugs, opined during his direct examination at trial that Mion "appeared to be under the

5

influence of a stimulant" that evening. When asked to explain further, the officer testified that stimulant use can cause a person to become "agitated" and "highly animated," and to "not speak[] in a sensical way."

¶ 17 On cross-examination, Mion's counsel asked the officer whether the joint Mion smoked could have contained a stimulant:

> Q. Marijuana can be smoked in a cigarette, a joint?
>
> A. Yes, sir.
>
> Q. And . . . while it appears to be marijuana, it can be mixed with other substances, correct?
>
> A. It's possible.
>
> Q. Including stimulants?
>
> A. Yes, sir.

¶ 18 Then, Mion's counsel focused on synthetic marijuana, or "spice," a type of stimulant:

> Q. Are you familiar with spice?
>
> A. Yes, sir.
>
> Q. What is that?
>
> A. Synthetic marijuana.
>
> Q. . . . [C]an that also be smoked in a joint?
>
> A. Yes, sir.

Q. . . . [D]o you know if . . . while they're smoking it they would know whether they're smoking marijuana or spice?

A. I don't believe so, but I can't say for sure.

Q. Okay. And have you seen the effects that spice can have on individuals?

A. Yes, sir.

Q. Can it act differently than marijuana does?

A. Yes, sir.

Q. And cause a stimulant kind of effect?

A. Yes, sir.

C. The Jury Instruction Conference and Ruling at Issue

¶ 19    During the jury instruction conference, Mion's counsel argued that Mion was entitled to assert the affirmative defense of involuntary intoxication based on his description of his past drug use, his experiences regarding the effects of those drugs, and the very different effects he experienced smoking the joint with his friend on the summer night in 2019. Counsel highlighted the evidence that "there can be things laced with marijuana" and argued that the jury should be allowed to determine "if there was something unknown in what [Mion] smoked that caused a blackout." Counsel likened Mion's situation to one where an

7

unknown substance is placed in a bar patron's alcoholic drink without the patron's knowledge.

¶ 20    In response, the prosecutor, noting the lack of published Colorado case on point, argued that a defendant who ingests an intoxicating substance that causes an unexpected effect must present additional evidence of his "due diligence" to assert the affirmative defense of involuntary intoxication.  In doing so, the prosecutor emphasized that Mion didn't ask his friend what was in the joint.

¶ 21    The court denied Mion's request for a jury instruction on involuntary intoxication, explaining that

> [Mion] admitted to using marijuana.  In other words, he admitted to using an intoxicant, and that use was voluntary.  The question is whether or not there was [an]other type of drug . . . that he was unaware of [that made his intoxication involuntary].
>
> There's absolutely no credible evidence that there was an intoxicant that . . . raised the issue of involuntary intoxication.  The only thing in the evidence is that [Mion] used marijuana [and] he felt different . . . .
>
> [Mion] also testified that . . . modern-day marijuana . . . has different strengths now.  And . . . he doesn't use it as much as he did before . . . .  [Arguing that] there must have

8

been something else in the marijuana . . . is pure speculation . . . .

[Mion] was aware. He was taking an intoxicant. There was a result. There is no evidence that it was anything other than marijuana other than he felt differently.

### D. The Result of the Trial

¶ 22 The jury found Mion guilty of robbery, criminal mischief, and misdemeanor menacing (while rejecting the People's contention that he used or threatened the use of a deadly weapon). The trial court sentenced Mion to forty months in community corrections.

### II. Standard of Review

¶ 23 This appeal requires us to interpret the Colorado statute governing the affirmative defense of involuntary intoxication, section 18-1-804, C.R.S. 2023. We review questions of statutory interpretation de novo. *Orellana-Leon v. People*, 2023 CO 34, ¶ 9. We also review de novo whether a defendant presented sufficient evidence entitling him to present an affirmative defense to the jury. *Pearson v. People*, 2022 CO 4, ¶ 16.

### III.  Analysis

#### A.  The General Law in Colorado Governing the Affirmative Defense of Involuntary Intoxication

¶ 24    The statutory affirmative defense of involuntary intoxication provides that "[a] person is not criminally responsible for his conduct if, by reason of intoxication that is not self-induced at the time he acts, he lacks capacity to conform his conduct to the requirements of the law." § 18-1-804(3).  "Intoxication" means "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 18-1-804(4). "Self-induced intoxication" means

> intoxication caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body, unless they were introduced pursuant to medical advice or under circumstances that would afford a defense to a charge of crime.

§ 18-1-804(5).

¶ 25    Based on our supreme court's interpretation of section 18-1-804, a defendant claiming involuntary intoxication must introduce some credible evidence that

(1) a substance was introduced into his or her body; (2) the substance was not known to be an intoxicant or was taken pursuant to medical advice, or the defendant did not know the substance could act as an intoxicant; (3) the substance caused a disturbance of mental or physical capacities; and (4) the introduction of the substance resulted in the defendant's lack of capacity to conform his or her conduct to the requirements of law.

*People v. Voth*, 2013 CO 61, ¶ 19 (citing *People v. Garcia*, 113 P.3d 775, 783 (Colo. 2005)).  We will refer to this as the *Voth* test.

B.    There Are No Published Colorado Cases with Similar Facts

¶ 26    Before analyzing the language in section 18-1-804 as it applies to Mion's proffered defense, we note that there are no published Colorado cases with similar facts to those presented in this case — namely, where a defendant ingests something he knows to be an intoxicant but asserts that a different intoxicant that he didn't know was present caused his inability to conform his conduct to the law.  Both parties compare and contrast this case to *People v. Low*, 732 P.2d 622 (Colo. 1987), and Mion also relies on *People v. Turner*, 680 P.2d 1290 (Colo. App. 1983).  But neither of those cases is particularly instructive here.

¶ 27    In *Low,* the defendant consumed a large quantity of over-the-counter cough drops during a lengthy car trip in his continuing efforts to quit using tobacco.  732 P.2d at 625.  The cough drops contained dextromethorphan hydrobromide, which, in such excessive quantities, caused the defendant's psychotic and delusional behavior, leading him to commit the charged offenses.  *Id.* at 625-26, 628.  The supreme court indicated that the defendant had a potentially viable claim of involuntary intoxication because neither the packaging on the cough drops nor the defendant's prior use of them put him on notice that using them in excessive quantities could cause intoxication.  *See id.*  In other words, the defendant wasn't aware that the substance he was knowingly ingesting would intoxicate him.

¶ 28    Similarly, *Turner* involved the defendant's use of migraine medication in quantities that exceeded the prescribed dosage.  680 P.2d at 1291-92.  When the defendant had previously used the medication in excess of the prescribed dosage, it had simply made him drowsy.  *Id.*  But on the day in question, it caused him to lack any memory of where he was or what he was doing at the time he committed his crimes.  *Id.*  A division of this court concluded that

12

the defendant was entitled to raise the affirmative defense of involuntary intoxication based on his testimony that he hadn't been warned of the consequences of exceeding the prescribed dosage, and his past experiences exceeding the prescribed dosage had caused only drowsiness. *Id.* at 1293.

¶ 29 In both of those cases, the defendants *knew what substances they were ingesting* but didn't know or have reason to know *that the substances could cause intoxication.* That scenario clearly falls within the involuntary intoxication statute and satisfies the *Voth* test. *See* § 18-1-804(5) (involuntary intoxication doesn't apply where the intoxication was caused by substances that "the defendant knows or ought to know have the tendency to cause intoxication"); *Voth,* ¶ 19 (involuntary intoxication includes, among other scenarios, the situation where a defendant knowingly ingested a substance but "did not know the substance could act as an intoxicant").

¶ 30 That's not the situation here. Mion claimed that the joint he smoked must have contained a stimulant, but that he didn't know or have reason to know that it contained a stimulant. The People, on the other hand, argue that there's insufficient evidence that

13

Mion ingested anything other than beer and marijuana, and it was the marijuana's potency that caused the full degree of his intoxication. At first glance, that appears to be a disputed issue of fact for a jury to resolve (and in Part III.D below, we address whether Mion presented sufficient evidence entitling him to have the jury resolve that disputed issue of fact). *See City of Fountain v. Gast*, 904 P.2d 478, 482 (Colo. 1995) ("It is the sole province of the jury to resolve disputed issues of fact and to determine credibility of witnesses, weight to be accorded testimony, and inferences to be drawn from evidence.").

¶ 31 The central factual dispute here is *what substance* caused the intoxication that allegedly deprived Mion of the capacity to conform his conduct to the requirements of the law. That's different than *Low* and *Turner*, where the substances at issue were undisputed.

¶ 32 *Low* and *Turner* certainly don't comprehensively cover every permutation of potentially cognizable involuntary intoxication claims. In terms of case law from other jurisdictions, the Minnesota Supreme Court, for example, has recognized four different kinds of involuntary intoxication: unexpected intoxication resulting from the ingestion of a medically prescribed drug, pathological intoxication,

14

coerced intoxication, and intoxication by innocent mistake. *City of Minneapolis v. Altimus*, 238 N.W.2d 851, 856 (Minn. 1976).

¶ 33    Could Mion's claim properly fall within the category of involuntary intoxication by innocent mistake? *See Hendershott v. People*, 653 P.2d 385, 396 n.10 (Colo. 1982) ("Involuntary intoxication . . . *is without moral culpability* and, for this reason, is a complete defense to all crimes.") (emphasis added). Along these lines, Mion argues that his claim is akin to that of a bar patron who (1) knowingly drinks alcohol (which, like marijuana, is an intoxicant); but (2) in so doing, unknowingly ingests a different drug that causes more intense and severe intoxication (such as a "date rape" drug). *See People v. Miller*, 113 P.3d 743, 746-47, 746 n.6 (Colo. 2005) (explaining that the trial court had instructed the jury on involuntary intoxication in response to the defendant's claim that the victim slipped a "date rape" drug into the defendant's alcoholic drink).[1]

---

[1] Although *People v. Miller*, 113 P.3d 743 (Colo. 2005), involved a defendant who claimed that he was "slipped a mickey," the opinion doesn't help resolve the issue presented here because, in that case, there was "no dispute concerning the instructions addressing the involuntary intoxication." *Id.* at 750. Instead, the instructional

¶ 34    Given the lack of Colorado case law on point, we turn to the language of the involuntary intoxication statute to determine whether Mion's claim — which essentially alleges involuntary intoxication by innocent mistake — is legally cognizable under Colorado's involuntary intoxication statute.

### C.    Mion's Proffered Defense Is Legally Cognizable Under the Involuntary Intoxication Statute

¶ 35    Under section 18-1-804(3), "[a] person is not criminally responsible for his conduct if, *by reason of intoxication that is not self-induced* at the time he acts, he lacks capacity to conform his conduct to the requirements of the law." (Emphasis added.) In other words, the defendant's inability to control his conduct must be caused by intoxication that isn't self-induced. Thus, involuntary intoxication is defined in terms of what it isn't — "self-induced" — not what it is.

¶ 36    "Self-induced intoxication" is intoxication caused by substances (1) "which the defendant knows or ought to know have the tendency to cause intoxication" and (2) "which he knowingly

---

issue related to the *voluntary* intoxication instruction the court gave. *Id.* at 745 n.2, 750-51.

16

introduced or allowed to be introduced into his body" (unless they were introduced pursuant to medical advice or "under circumstances that would afford a defense to a charge of crime"). § 18-1-804(5).

¶ 37    The statute doesn't squarely address the scenario advanced by Mion involving the ingestion of multiple intoxicants, some of which are ingested knowingly and some of which are ingested unknowingly. But based on our interpretation of the statute, we conclude that courts must focus on *the particular intoxicant* that allegedly deprived the defendant of the capacity to conform his conduct to the requirements of the law. To rule otherwise would mean that anytime a person knowingly ingests an intoxicant — no matter how mild — the person will be criminally responsible for any resulting behavior, even if what was ingested contained, unbeknownst to the defendant, a different intoxicant — no matter how potent and mind-altering.

¶ 38    Under section 18-1-804(5), intoxication that deprives a person of the capacity to conform his conduct to the requirements of the law is "self-induced" *only where* that debilitating intoxication is caused by substances that the defendant "knowingly introduced or

17

allowed to be introduced into his body." And using Mion's example, if a bar patron becomes incapacitated because someone slipped a "date rape" drug into the patron's alcoholic drink, the patron didn't "knowingly" ingest the "date rape" drug.

¶ 39 Further, under that scenario, we conclude that the bar patron also didn't "knowingly . . . *allow*[] [the "date rape" drug] to be introduced into his body." § 18-1-804(5) (emphasis added). Instead, we conclude that the "allowed to be introduced" language in section 18-1-804(5) refers to the situation where someone else introduces an intoxicant into the defendant's body *with the defendant's knowledge* — for example, where a defendant voluntarily allows someone else to inject him with a hypodermic needle containing what he knows to be an intoxicant.

¶ 40 Having said that, we also conclude that the *Voth* test doesn't capture all the scenarios that could constitute involuntary intoxication under section 18-1-804. As a reminder, the second prong of the *Voth* test requires the defendant to show that (a) the ingested substance "was not known to be an intoxicant"; (b) the ingested substance "was taken pursuant to medical advice"; or (c) "the defendant did not know the substance could act as an

intoxicant."  *Voth*, ¶ 19.  That test simply does *not* account for the scenario where a person *unknowingly* ingests a substance that is widely known to be an intoxicant.  But that scenario *does* fall squarely within the language of the involuntary intoxication statute.  *See* § 18-1-804(3), (5) (Intoxication that deprives a person of the "capacity to conform his conduct to the requirements of the law" is self-induced *only where* that debilitating intoxication is caused by substances that the defendant "knowingly introduced or allowed to be introduced into his body.").

¶ 41     It can certainly be argued, perhaps persuasively, that Mion's conduct here was more reckless than that of a bar patron who assumes that their alcoholic drink is unadulterated.  Indeed, the joint Mion smoked wasn't sold to him directly from a regulated marijuana dispensary, and Mion didn't ask his friend what was in the joint.  We conclude, however, that those facts don't transform this case into one where we can conclude *as a matter of law* that Mion can't claim involuntary intoxication.  Indeed, nothing in the involuntary intoxication statute refers to the concept of recklessness or, as the People characterize it, assuming the risk.

19

¶ 42    Because we conclude that the type of involuntary intoxication claim that Mion raised is legally cognizable under the involuntary intoxication statute, we proceed to evaluate whether Mion presented sufficient evidence entitling him to a jury instruction on involuntary intoxication.

### D.    Mion Presented Sufficient Evidence to Warrant an Involuntary Intoxication Instruction

¶ 43    A defendant is entitled to a jury instruction on an affirmative defense if he presents "some credible evidence" supporting the defense.  § 18-1-407(1), C.R.S. 2023.  Colorado appellate courts have understood the phrase "some credible evidence" to be interchangeable with "some evidence," "any credible [even if highly improbable] evidence," "a scintilla of evidence," a "small quantum of evidence," and "any evidence."  *Galvan v. People*, 2020 CO 82, ¶ 24.  As those phrases indicate, the evidentiary threshold to be entitled to have a jury instructed on an affirmative defense is low.  *People v. Opana*, 2017 CO 56, ¶ 17.

¶ 44    The only way Mion could have conclusively demonstrated that the joint he smoked contained a stimulant far different than beer or marijuana would have been for Mion's counsel to track down the

20

joint that Mion smoked (assuming any of it still existed) and have chemical tests performed on it. That, of course, didn't happen.

¶ 45 However, we conclude that the following *circumstantial* evidence, taken together, was sufficient to cross the low threshold entitling Mion to a jury instruction on involuntary intoxication:

- Mion testified that he assumed the joint contained marijuana, it smelled like marijuana, and it didn't have a strange taste.

- A police officer testified that he didn't think someone smoking a joint would be able to tell the difference between marijuana and spice.

- The officer testified that spice can have a different effect than marijuana — that of a stimulant.

- Stimulant use typically causes a person to become "agitated" and "highly animated," and to "not speak[] in a sensical way."

- Mion was behaving in an "agitated" and "erratic" manner on the evening in question.

- The officer opined that Mion was under the influence of a stimulant on that evening.

- Mion had smoked marijuana on hundreds of occasions, including around ten times per year in recent years.

- Mion testified that marijuana had never caused him to act in the way he acted on the evening in question — behavior evidenced by surveillance footage of his offenses and his arrest.

¶ 46 The People suggest that Mion wasn't entitled to assert involuntary intoxication based solely on his "self-proclaimed unexpected symptoms of intoxication." But the law is clear that a defendant is entitled to assert an affirmative defense "even if the only supporting evidence is 'highly improbable' testimony from the defendant." *Pearson*, ¶ 23 (quoting *People v. DeGreat*, 2018 CO 83, ¶ 22).

¶ 47 The People also cite a Tenth Circuit case for the proposition that "it is common knowledge that unlawful street drugs do not come with warranties of purity or quality associated with lawfully acquired drugs such as alcohol." *United States v. Bindley*, 157 F.3d 1235, 1242 (10th Cir. 1998) (quoting *People v. Velez*, 221 Cal. Rptr. 631, 637 (Ct. App. 1985)). The Tenth Circuit in *Bindley* further quoted *Velez* for the propositions that "unlawful street drugs are

frequently not the substance they purport to be or are contaminated with other substances not apparent to the naked eye" and "marijuana is frequently contaminated with PCP or other psychoactive drugs." *Id.* (quoting *Velez*, 221 Cal. Rptr. at 637-38).

¶ 48 Notably, though, the holdings in *Bindley* and *Velez* rested in large part on the fact that marijuana possession and consumption was illegal in those jurisdictions at that time. But the use of marijuana is, of course, legal under Colorado law and was at the time of Mion's offenses, so marijuana use doesn't have the same moral culpability as it once did. *See Hendershott*, 653 P.2d at 396 n.10 (stating that involuntary intoxication "is without moral culpability" and is therefore a complete defense to all crimes); *cf. Wells-Yates v. People*, 2019 CO 90M, ¶ 58 ("The General Assembly treats most drug felonies as substantially less grave or serious today than it has in the past, and this adjustment is the best evidence of the views held by our maturing society, as expressed through its representatives in the legislature."). We offer no opinion with respect to whether Mion's consumption was legal; nor do we perceive that it matters under the statute, just as it wouldn't matter to the availability of an involuntary intoxication instruction if the

23

bar patron whose drink was unknowingly spiked was underage at the time they consumed the spiked drink.

¶ 49     No evidence in the record indicates that, in Denver, marijuana is "frequently" contaminated with stimulants, such as spice or PCP. And there is no evidence that Mion knew, or even should have known, that the marijuana in the joint might be laced with a stimulant. *See Turner*, 680 P.2d at 1293 ("To deny defendant the chance to go to the jury on the issue of whether his intoxication was involuntary . . . is to give more weight to what might be assumed to be common knowledge of the effects of ingesting an excessive dose of a drug, than the specific evidence elicited on the subject."). The facts that the joint Mion smoked wasn't sold to him directly by a regulated marijuana dispensary and that Mion didn't ask his friend what was in the joint can be argued to the jury at his retrial, but they don't render his defense invalid or unavailable as a matter of law.

¶ 50     As the People argue, Mion may have simply been under the influence of potent marijuana that evening. We, however, must view the evidence in the light most favorable to Mion in determining whether he was entitled to an involuntary intoxication instruction.

*See People v. Gallegos*, 2023 COA 47, ¶ 48.  We can't conclude that Mion's theory of involuntary intoxication was so unreasonable as to render it invalid as a matter of law.  *See O'Shaughnessy v. People*, 2012 CO 9, ¶ 13 (If a court "determines as a matter of law that no evidence exists in the record to support an affirmative defense, then the instruction need not be presented to the jury because there is no issue of fact for the jury to resolve.").

## E. Reversal is Required

¶ 51    The parties disagree on the appropriate standard for determining whether the identified error warrants reversal.

¶ 52    Mion relies on *Garcia* for the proposition that a trial court's error in not allowing a defendant to raise an affirmative defense at trial warrants automatic reversal.  There, the supreme court held, "If the trial court errs in disallowing an affirmative defense, then it improperly lowers the prosecution's burden of proof.  Because a defendant's constitutional right to due process is violated by an improper lessening of the prosecution's burden of proof, such error cannot be deemed harmless."  *Garcia,* 113 P.3d at 784 (citation omitted).

¶ 53    But the People, relying on *Hagos v. People*, 2012 CO 63, ¶ 11, argue that we should review for constitutional harmless error. Although *Hagos* didn't involve an alleged failure to instruct the jury on an affirmative defense, the supreme court has more recently held that an error in failing to instruct the jury on an affirmative defense "is subject to constitutional harmless error review." *Pearson*, ¶ 16; *see also Griego v. People*, 19 P.3d 1, 8 (Colo. 2001) (holding that "when a trial court misinstructs the jury on an element of an offense, either by omitting or misdescribing that element, that error is subject to constitutional harmless" error review).

¶ 54    We will assume, without deciding, that we should review for constitutional harmless error. And reversal is warranted under that standard. Under constitutional harmless error review, we must reverse unless the error was harmless beyond a reasonable doubt. *Id.* Under that test, we must reverse if "there is a reasonable *possibility* that the [error] might have contributed to the conviction." *Hagos*, ¶ 11 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The People bear the burden of showing that the error was harmless beyond a reasonable doubt. *Id.*

¶ 55    On appeal, the People have presented no specific argument that any error by the trial court was harmless beyond a reasonable doubt.  Instead, they contend that the court properly declined to give the requested instruction.  And on this record, we can't conclude that the trial court's error was harmless beyond a reasonable doubt.  Depending on how the jury assessed Mion's credibility and weighed the evidence, it could've reasonably concluded that the prosecution didn't disprove the affirmative defense of involuntary intoxication beyond a reasonable doubt.  *See* § 18-1-407(2) ("If the issue involved in an affirmative defense is raised, then the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense.").  As an appellate court, we can't weigh the evidence, and we have no insight into the credibility of Mion's testimony at trial.  *See People v. Mejia-Mendoza*, 965 P.2d 777, 780 (Colo. 1998) ("Appellate courts are not the appropriate forum to resolve factual discrepancies or to determine the credibility of witnesses.").

## IV.   Disposition

¶ 56    The judgment is reversed, and the case is remanded for a new trial.

JUDGE LIPINSKY and JUDGE GOMEZ concur.