2013 CO 61

**In re: The PEOPLE of the State of Colorado, Plaintiff**

**v.**

**Paul Lesley VOTH, Defendant.**

**Supreme Court Case No. 13SA113**

Supreme Court of Colorado.

October 21, 2013

145

Thom K. LeDoux, District Attorney, Eleventh Judicial District, Molly Chilson, Deputy District Attorney, Salida, Colorado, Attorneys for Plaintiff.

The Marquez Law Office, P.C., Ernest F. Marquez, Salida, Colorado, Attorney for Defendant.

The Gasper Law Group, PLLC, Stephen A. Brunette, Allen C. Gasper, Caryn J. Adams, Matthew B. Drexler, Colorado Springs, Colorado, Attorneys for Amicus Curiae.

JUSTICE RICE delivered the Opinion of the Court.

¶1 In this original C.A.R. 21 proceeding, we review the trial court's oral order allowing the Defendant, Paul Voth, to assert involuntary intoxication as an affirmative defense under section 18–1–804, C.R.S. (2013). We issued a rule to show cause why the trial court's order should not be vacated. We now hold that the trial court abused its discretion when it found that a virus qualifies as a "substance" that can result in intoxication under section 18–1–804. The trial court therefore also abused its discretion in finding that Voth was entitled to assert involuntary intoxication because this finding was based on an erroneous view of the word "substance." Accordingly, we make the rule absolute and remand for further proceedings consistent with this opinion.

¶2 Because the trial court based its findings (in part) on our prior dictum suggesting that insanity cannot be temporary under Colorado's statutory framework, we take this opportunity to clarify *People v. Garcia*, 113 P.3d 775, 782 (Colo.2005), and *Bieber v. People*, 856 P.2d 811, 817 (Colo.1993). As we noted in *People v. Low*, 732 P.2d 622, 626 n. 4, 632 (Colo.1987), Colorado does not have a special statutory provision for "temporary insanity" because the general definition of insanity outlined in section 16–8–101.5, C.R.S. (2013), encompasses both temporary and long-term bouts of insanity. Accordingly, a defendant who was found to be legally insane at the time of the offense, but shortly thereafter regains sanity, may assert insanity as an affirmative defense if he or she meets all of the other relevant requirements.

### I. Facts

¶3 On June 16, 2012, Voth was arrested after firing several gunshots in a rural subdivision where he lived. David Arnold, one of Voth's neighbors, initially saw Voth shooting at a stack of wood pallets near Voth's garage. Shortly thereafter, Arnold, who was standing on the front deck of his home, called out to Voth from across the street, and Voth fired

his handgun toward Arnold. Voth then fired a second shot toward Arnold, prompting Arnold to retreat into his home and call 911. While Arnold and his wife were waiting for police officers to arrive, they heard more gunfire and then saw Voth standing on their front deck. Police officers intervened when Voth began shaking the front door knob in an attempt to gain entry to the Arnolds' home.

¶4 Following his arrest, Voth was taken to the emergency room at Heart of the Rockies Regional Medical Center. He was then transferred to Denver Health Medical Center ("Denver Health"), where he remained from June 17 to July 2, 2012. Denver Health reported that Voth was disoriented when he arrived at the hospital due to visual and auditory hallucinations. Voth's delirium began to subside around July 25, 2012.[1] Although Denver Health suspected that viral encephalitis was the source of Voth's psychotic episode, it was unable to reach a definitive diagnosis.

### II. Procedural History

¶5 The People charged Voth with the following six counts: (1) attempted second degree murder; (2) attempted first degree burglary; (3) second degree assault; (4) felony menacing; (5) illegal discharge of a firearm; and (6) reckless endangerment. On August 29, 2012, Voth entered a plea of not guilty by reason of insanity ("NGRI") pursuant to section 16–8–101.5, and the trial court ordered a mental health evaluation as required by section 16–8–105.5, C.R.S. (2013).

¶6 Dr. Richard Pounds conducted the court-ordered mental health evaluation and diagnosed Voth with resolved delirium due to a general medical condition, sustained remission alcohol dependence, and hypertension. In his report, Dr. Pounds concluded that Voth was presently competent but that Voth met the statutory criteria for legal insanity on the date of the incident. Dr. Pounds opined that the most likely cause of Voth's psychotic episode was an unidentified viral

---

1. Prior to his hospitalization at Denver Health, Voth had been hospitalized for similar symptoms in March and early June of 2012.

infection. Significantly, Dr. Pounds considered and explicitly rejected the possibility that the psychotic episode was the result of intoxication.

¶ 7 After receiving Dr. Pounds's report, the People stipulated to the NGRI finding and requested that Voth be committed to a mental health facility pursuant to *People v. Laeke*, 2012 CO 13, ¶ 17, 271 P.3d 1111, 1115–16 (holding that a defendant does not have the right to a jury trial where a plea of NGRI is entered and the prosecution concedes that the defendant was insane at the time of the offense), and section 16–8–105.5(4) (requiring that a defendant found NGRI be committed to the department of human services for care and psychiatric treatment until he or she is deemed eligible for release). Thereafter, Voth attempted to withdraw his NGRI plea. The People objected, and the trial court scheduled a hearing to determine if Voth would be allowed to present evidence of his medical condition in the absence of an NGRI plea.

¶ 8 At the hearing, Voth raised the affirmative defense of involuntary intoxication for the first time.[2] Dr. Pounds testified by phone in support of Voth's new defense. Specifically, Dr. Pounds testified that Voth had suffered a disturbance of mental capacities at the time of the incident as required by section 18–1–804 and that this disturbance was caused by an unidentified viral infection.[3]

¶ 9 Contrary to Dr. Pounds's initial report—where he concluded that Voth was legally insane on the date of the incident and that his condition "did not fit a pattern of intoxication for any substance [he was] familiar with"—Dr. Pounds testified that he now believed that Voth met the legal criteria for involuntary intoxication. Dr. Pounds stated that his new conclusion was based on his review of *People v. Garcia*, 113 P.3d 775 (Colo.2005), which suggests that Colorado's statutory framework does not recognize temporary insanity.[4] Acknowledging that he did not "think any medical physician would refer to [a viral] encephalitis as an intoxication," Dr. Pounds made a point to confine his conclusion to the legal context. Transcript of Hearing at 33, *People v. Voth*, 2012CR72 (Chaffee Dist. Mar. 14, 2013) [hereinafter Transcript] ("[W]e're talking intoxication as a legal term.").

¶ 10 Following Dr. Pounds's testimony, Voth asked the trial court to find that the evidence was sufficient to submit the affirmative defense of involuntary intoxication to the jury. Despite the People's objection, the trial court issued an oral order finding that Voth's offer of proof met the requirements for involuntary intoxication as outlined in *Garcia*. Importantly, the trial court's finding was premised on its belief that a virus qualifies as a "substance" under section 18–1–804(4).

¶ 11 The People petitioned this Court under C.A.R. 21 for a review of the trial court's order. Specifically, the People contended that the trial court abused its discretion when it found that a virus constitutes a "substance" under section 18–1–804(4). We issued a rule to show cause why the trial court's order should not be vacated.

### III. Original Jurisdiction

¶ 12 Original relief pursuant to C.A.R. 21 is an extraordinary remedy that is limited both in purpose and availability.

---

2. Unlike a defendant who is found NGRI, which results in commitment until the defendant is deemed eligible for release per section 16–8–105.5(4), a defendant who is acquitted based on an involuntary intoxication defense is immediately free to return to society. *People v. Garcia*, 113 P.3d 775, 783 (Colo.2005).

3. Although Dr. Pounds believed that Voth's condition was caused by a virus, laboratory tests conducted shortly after the incident did not detect a virus. For the purposes of our analysis, however, we will assume that Voth was infected by a virus that caused the disturbance of his mental or physical capacities on the date of the incident.

4. Specifically, Dr. Pounds testified:
   If, again, a mental defect can't be temporary, which again, I was ignorant of that [when I wrote my report], then, no, he does not fit the mental defect [under the insanity statute].... But, again, it gets back [to], is a mental defect by definition permanent[?] And if it's permanent, then I was wrong, he did not meet the criteria for a mental defect.
   Transcript of Hearing at 34–35, *People v. Voth*, 2012CR72 (Chaffee Dist. Mar. 14, 2013).

*People v. Darlington,* 105 P.3d 230, 232 (Colo.2005). This Court will exercise original jurisdiction to review whether the trial court abused its discretion in situations where the petition raises an issue of first impression that is of significant public importance, *In re Marriage of Wiggins,* 2012 CO 44, ¶ 12, 279 P.3d 1, 5, and where the normal appellate process would prove inadequate, *Warden v. Exempla, Inc.,* 2012 CO 74, ¶ 16, 291 P.3d 30, 34.

¶ 13 In criminal cases, this Court has found the normal appellate process to be inadequate where the prosecutor would be barred from retrial post-acquittal due to double jeopardy. *See, e.g., People v. Smith,* 254 P.3d 1158, 1161 (Colo.2011) (electing to exercise original jurisdiction to hear the prosecutor's interlocutory appeal because wrongful suppression of the evidence at issue would force the prosecutor to wait for post-acquittal relief, which would preclude retrial per double jeopardy). This Court has also held that the normal appellate process is inadequate in criminal cases where the jury's decision could render the pretrial issue moot. *See, e.g., Wood v. People,* 255 P.3d 1136, 1141–42 (Colo.2011) (holding that the defendant had to appeal the trial court's pretrial determination that he failed to establish immunity under the "make-my-day" statute before trial via C.A.R. 21 because the issue became moot when the jury found that immunity did not exist beyond a reasonable doubt).

¶ 14 Exercise of our original jurisdiction is warranted in this case because the trial court's finding that a virus qualifies as a "substance" (1) raises an important issue of first impression for this Court regarding the scope of the involuntary intoxication affirmative defense following our decision in *Garcia,* and (2) would not be reviewable through the conventional appellate process due to potential double-jeopardy or mootness issues.

## IV. Standard of Review

¶ 15 When a trial court has discretion to decide an issue, we review that decision under an abuse of discretion standard. *People v. Rath,* 44 P.3d 1033, 1043 (Colo. 2002). To constitute an abuse of discretion, the trial court's decision must be "manifestly arbitrary, unreasonable, or unfair." *Id.* A trial court necessarily abuses its discretion if its ruling is based on an erroneous view of the law. *People v. Wadle,* 97 P.3d 932, 936 (Colo.2004).

## V. Analysis

¶ 16 We hold that the trial court abused its discretion when it found that a virus was a "substance" under section 18–1–804 because its ruling was based on an erroneous interpretation of the statute. Because the trial court had an erroneous view of the law, its finding that Voth offered sufficient evidence under *Garcia* to assert the affirmative defense of involuntary intoxication was necessarily also an abuse of discretion.

¶ 17 We also clarify that Colorado does not distinguish between temporary insanity and long-term insanity because both are contemplated by the general insanity affirmative defense outlined in section 16–8–101.5. While it is true that temporary insanity is not represented in Colorado's statutory framework by way of a specific provision, it is also true that defendants who suffer from insanity at the time of their alleged crimes, but later regain their sanity, are permitted to assert insanity under section 16–8–101.5. *People v. Low,* 732 P.2d 622, 626 n. 4, 632 (Colo.1987).

### A. A Virus Is Not a "Substance" That Results in Intoxication Under Section 18–1–804

¶ 18 Under section 18–1–804(3), involuntary intoxication is an affirmative defense. *See also* § 18–1–805, C.R.S. (2013). Unlike voluntary intoxication (i.e., self-induced intoxication), involuntary intoxication is a defense to all crimes and functions to completely absolve a defendant of criminal responsibility for his or her conduct. § 18–1–804. In order to submit this affirmative defense to the jury, a defendant must first offer proof that constitutes "some credible evidence" of involuntary intoxication. § 18–1–407(1), C.R.S. (2013); *People v. Garcia,* 113 P.3d 775, 783 (Colo.2005).

¶ 19 In *Garcia,* this Court interpreted section 18–1–804 and outlined four requirements that a defendant must satisfy

in order to benefit from the involuntary intoxication affirmative defense. *See id.* Specifically, a defendant must provide some credible evidence that: (1) a substance was introduced into his or her body; (2) the substance was not known to be an intoxicant or was taken pursuant to medical advice, or the defendant did not know the substance could act as an intoxicant; (3) the substance caused a disturbance of mental or physical capacities; and (4) the introduction of the substance resulted in the defendant's lack of capacity to conform his or her conduct to the requirements of law. *Id.* Whether a particular defendant has provided some credible evidence of these four requirements, and is therefore eligible to assert involuntary intoxication, is a question of law for the trial court. *Id.* at 784.

¶ 20 The primary issue presented in this case implicates the first *Garcia* requirement, namely that a defendant show credible evidence of the introduction of a "substance" into his or her body. This requirement stems from section 18–1–804(4), defining "intoxication" as "a disturbance of mental or physical capacities resulting from the introduction of any *substance* into the body" (emphasis added). A defendant who is unable to show that a "substance" was introduced into his or her body is necessarily ineligible to assert involuntary intoxication. Importantly, the word "substance" is not defined in section 18–1–804 (Intoxication) or section 18–1–901, C.R.S. (2013) (Criminal Code definitions), and this Court has not yet had occasion to interpret the legislature's intended meaning.

### 1. Principles of Statutory Interpretation

¶ 21 Because the word "substance" is not expressly defined within the Criminal Code, we must apply the principles of statutory construction to determine and give effect to the meaning intended by the legislature. *See People v. Madden,* 111 P.3d 452, 457 (Colo.2005). "To discern the legislative intent, we look first to the plain and ordinary meaning of the statutory language." *Id.* A commonly accepted meaning is preferred over a strained or forced interpretation. *M.S. v. People,* 812 P.2d 632, 636 (Colo. 1991). Where the intent of the legislature can be deciphered with reasonable certainty, we need not resort to other rules of statutory construction. *People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986).

¶ 22 We hold that the meaning of the word "substance" as used in section 18–1–804 is unambiguous [5] and can be determined with reasonable certainty. After reviewing common dictionary definitions of "substance," relevant case law, and the statutory context in which the term appears, we conclude that the plain and ordinary meaning of the word "substance" excludes viruses as a matter of law.

### 2. Plain and Ordinary Meaning of "Substance"

¶ 23 In determining the plain and ordinary meaning of words, courts may look to the dictionary for assistance. *See, e.g., People v. Huckleberry,* 768 P.2d 1235, 1238 (Colo.1989) (looking to *Black's Law Dictionary* in determining that the defense of "alibi" is not an affirmative defense). The general and legal dictionary definitions of "substance" suggest that the legislature intended the term to encompass things like drugs and alcohol that are traditionally understood to cause intoxication. For example, *Merriam–Webster Online Dictionary* defines "substance" as "something (as drugs or alcoholic beverages) deemed harmful and usually subject to legal restriction." *Substance, Merriam–Webster,* http://www.merriam-webster.com/dictionary/substance (last visited Oct. 17, 2013) (providing two sample phrases, "possession of a controlled substance" and "substance abuse"). Similarly, *Black's Law Dictionary* defines "substance" as "[a]ny matter, esp. an addictive drug." 1565 (9th ed. 2009) [hereinafter

---

5. Therefore, we need not apply the rule of lenity, which is to be applied only when we are unable "to discern the intent of the General Assembly." *Frazier v. People,* 90 P.3d 807, 811 (Colo.2004); *see also People v. Forgey,* 770 P.2d 781, 783 (Colo.1989) ("The rule of lenity should be used only to resolve statutory ambiguity, and not to create it by disregarding the clear legislative purpose for which the statute was enacted.").

*Black's*] (providing two sample phrases, "illegal substance" and "abuse of substance").

¶ 24 The legal definitions of "involuntary intoxication" and "intoxication" are also instructive in ascertaining the legislature's intent because the word "substance" (1) appears in a statute outlining the circumstances when a defendant can benefit from the affirmative defense of involuntary intoxication, and (2) is used in the general definition of "intoxication" in section 18–1–804(4).

¶ 25 Importantly, *Black's* defines "involuntary intoxication" as "[t]he ingestion of alcohol or drugs against one's will or without one's knowledge." *Id.* at 898. This definition, which explicitly identifies alcohol and drugs as catalysts of intoxication that would render a person involuntarily intoxicated if ingested or injected against his or her will, bolsters our conclusion that the legislature intended to limit the definition of "substance" to things that are commonly understood to result in intoxication.

¶ 26 Moreover, the *Black's* definition of "intoxication" provides valuable insight into why the legislature chose to define the word "intoxication" as "a disturbance of mental or physical capacities resulting from the introduction of *any substance* into the body." § 18–1–804(4) (emphasis added). According to *Black's*, "intoxication" is a "diminished ability to act with full mental and physical capabilities because of *alcohol or drug consumption;* drunkenness." 898 (emphasis added). Consistent with its definition of "involuntary intoxication," the *Black's* definition of "intoxication" explicitly contemplates drugs or alcohol as the source of intoxication. It follows that the legislature's decision to define the potential sources of intoxication more broadly than *Black's* (i.e., as "any substance" instead of limiting the definition to drugs and alcohol) simply evidences its desire to establish that things similar to drugs and alcohol—like prescription and over-the-counter medications—are also legally sufficient to cause intoxication.

¶ 27 This conclusion is supported by our holdings in *Garcia* and Low. In both cases,

this Court analyzed section 18–1–804 and concluded that things other than illegal drugs and alcohol were "substances" sufficient to form the basis of involuntary intoxication. More specifically, in *Garcia* this Court held, as a matter of law, that the medical condition of insulin-induced hypoglycemia could, in certain circumstances, meet the requirements for involuntary intoxication. 113 P.3d at 782 (explaining that "[i]nsulin is a substance prescribed for diabetics by doctors, and insulin-induced hypoglycemia is thus a drug-induced disturbance of one's mental and/or physical capacities" as required by section 18–1–804). In *Low*, this Court noted that ingesting large quantities of "HOLD" cough drops (which contain the drug dextromethorphan hydrobromide) could, in certain circumstances, support the affirmative defense of involuntary intoxication. 732 P.2d at 625, 628 (noting that the trial court's acquittal would have been proper if it had made a factual finding, based on some credible evidence, that the defendant was involuntarily intoxicated after consuming approximately 120 HOLD cough drops within a twenty-four-hour period and not sleeping).

¶ 28 Importantly, in determining that insulin-induced and cough drop-induced intoxication were sufficient to form the basis of involuntary intoxication, this Court noted that these substances require affirmative acts of injection or ingestion, respectively. *See Garcia*, 113 P.3d at 781 (noting that the defendant injected insulin on the morning of the alleged crime); *Low*, 732 P.2d at 625 (noting that the defendant consumed approximately 120 HOLD cough drops within the twenty-four-hour period prior to the alleged crime). Our reliance on the substance's method of introduction into the body is instructive because, like alcohol and drugs, insulin and cough drops can only enter the body as the result of a distinct and affirmative action, such as injection or ingestion.[6] Much to the contrary, viruses—which are both microscopic and ubiquitous—can be contracted anywhere in the environment without a person's awareness. Transcript at 9. As Dr.

---

6. While injection and ingestion clearly qualify as methods of "introduction" under section 18–1–804(4), we decline to specifically define "intro-
duction" because it is not essential to the resolution of this case.

Pounds testified, all it takes to acquire a virus is "being in the right place at the right time." *Id.* As relevant dictionary definitions and Colorado cases suggest, acquiring a microscopic virus via an untraceable exposure is fundamentally different from becoming intoxicated via the injection or ingestion of drugs, alcohol, or medication.

¶ 29 Further bolstering our holding that a commonsense definition of "substance" excludes viruses, our research has not revealed a single case where a defendant who allegedly committed a crime while infected with a virus was permitted to assert the affirmative defense of involuntary intoxication. We refuse to hold that the legislature intended for a virus to qualify as a "substance," a heretofore novel legal definition, when it crafted this statutory language over four decades ago.[7]

¶ 30 Significantly, the context in which the term "substance" appears in the Criminal Code further supports our conclusion that the legislature did not intend for viruses to qualify as substances under section 18–1–804. Courts frequently look to the statutory context when construing meaning. *Bd. of Cnty. Comm'rs of Cnty. of Boulder v. Hygiene Fire Prot. Dist.*, 221 P.3d 1063, 1066 (Colo.2009). In this case, the word "substance" appears in section 18–1–804, titled "Intoxication." Section 18–1–804 contains five subsections. Subsection 1 clarifies that intoxication is only a defense as provided in subsection 3 or to negate the existence of specific intent for specific-intent crimes; subsection 2 makes clear that intoxication alone does not constitute insanity; subsection 3 restricts availability of the affirmative defense to intoxication that was not self-induced; subsection 4 defines "intoxication"; and subsection 5 defines "self-induced intoxication."

¶ 31 Because the word "substance" appears in both subsection 4 (defining "intoxication" generally) and subsection 5 (defining "self-induced intoxication" specifically), the structure of the statute contemplates that a "substance" under section 18–1–804 could result in *either* voluntary or involuntary intoxication solely depending upon whether the defendant knew or should have known that the substance has the tendency to cause intoxication. This observation bolsters our conclusion that a virus is not a "substance" because a virus is not only invisible to the naked eye (making it nearly impossible to know definitively if or when a person has voluntarily come into contact with a virus) but also capable of living dormant in the human body for long periods of time (undermining the possibility that any resulting intoxication was truly voluntary).[8] Because it is clear that the legislature intended the word "substance" to encompass only things that could result in either voluntary or involuntary intoxication (like alcohol, drugs, and medication), we conclude that a virus is not a substance under section 18–1–804.

¶ 32 Moreover, despite his ultimate conclusion that Voth was intoxicated by a virus, Dr. Pounds's testimony supports our holding that the plain and ordinary meaning of "substance" excludes viruses as a matter of law. First, Dr. Pounds agreed with defense counsel that characterizing a virus as a "substance" would be "a *new way* to look at intoxication." Transcript at 12 (emphasis added). Second, Dr. Pounds stated that he did not believe that "any medical physician would refer to [a viral] encephalitis as an intoxication." *Id.* at 33. Third, in explaining why he no longer agreed with his initial report, Dr. Pounds admitted that at the time he wrote the report, Voth's condition "just didn't, in [his] opinion, fit an intoxication process that [he was] familiar with." *Id.* at 25. Finally, Dr. Pounds testified that prior to defense counsel providing him with a copy of the *Garcia* decision on the morning of the hearing, he had never before considered involuntary intoxication in a viral context. *Id.* at 22.

---

7. The current language contained in section 18–1–804 first appeared as section 40–1–904 in 1971. Prior to 1971, the provision in the Criminal Code relating to drunkenness, section 40–1–9 (Drunkenness no excuse—persons causing—how punished), did not include the word "substance."

8. As Dr. Pounds testified, "Many of us carry multiple viruses chronically." Transcript at 9.

¶ 33 After analyzing common dictionary definitions, Colorado case law, and the statutory context, we hold that the plain and ordinary meaning of "substance" under section 18–1–804 excludes viruses as a matter of law. Accordingly, the trial court abused its discretion in finding that (1) a virus was a substance, and (2) Voth presented some credible evidence of involuntary intoxication. We therefore vacate the trial court's order, make the rule absolute, and remand for proceedings consistent with this opinion.

## B. The Mental Disease or Defect Underlying an Insanity Plea Can Be Temporary Under Section 16–8–101.5

¶ 34 This case requires us not only to interpret the meaning of the word "substance" as it is used in the intoxication statute but also to clarify whether Colorado's insanity statute excludes defendants who experience short-term bouts of insanity. Like involuntary intoxication, insanity is an affirmative defense in Colorado. *See* § 18–1–805, C.R.S. (2013) (Responsibility—affirmative defense); § 16–8–101.5, C.R.S. (2013) (Insanity defined—offenses committed on and after July 1, 1995); § 16–8–101 (Insanity defined—offenses committed before July 1, 1995). To establish insanity, a defendant must demonstrate: (1) that he or she was so diseased or defective in mind at the time of the act, (2) as a result of a severely abnormal mental condition, (3) which grossly and demonstrably impaired his or her perception or understanding of reality, (4) that he or she was incapable of distinguishing right from wrong with respect to the act committed. *Garcia,* 113 P.3d at 783; *see* § 16–8–101.5; § 16–8–102, C.R.S. (2013).

¶ 35 In *Garcia,* this Court made clear that insanity and involuntary intoxication are separate and distinct affirmative defenses in Colorado. While both defenses function to absolve a defendant of criminal liability, they differ in three important respects. First, unlike involuntary intoxication, which is not subject to any special pleading requirement, insanity requires a defendant to enter a specific plea at arraignment (or prior to trial if good cause is shown). *Garcia,* 113 P.3d at 783, 783 n. 8.

Second, the proof that a defendant must offer to support insanity is much different from the proof required to support involuntary intoxication. *See id.* (clearly enumerating the proof required to assert the defenses of involuntary intoxication and insanity); *compare* § 18–1–804 (Intoxication), with § 16–8–101.5 (Insanity defined). Third, a defendant who is found NGRI is committed to the department of human services until determined eligible for release, while a defendant who is acquitted as a result of involuntary intoxication is free to immediately return to society. *Garcia,* 113 P.3d at 783.

¶ 36 In addition to these three differences, our dictum in *Garcia* suggested a fourth difference between involuntary intoxication and insanity, namely that only involuntary intoxication can be temporary in nature because Colorado does not recognize temporary insanity. This dictum played an important role in the present case because both the trial court and Dr. Pounds relied on it (at least in part) to reach the conclusion that Voth—whose delirium resolved before trial—was entitled to assert involuntary intoxication. Thus, a secondary issue presented by this case is whether the mental disease or defect underlying an insanity plea can be temporary in nature.

¶ 37 With regard to crimes committed in Colorado on and after July 1, 1995, a defendant can establish insanity in one of two ways. Section 16–8–101.5(1) outlines the applicable test of insanity as follows:

(a) A person who is so diseased or defective in mind *at the time of the commission of the act* as to be incapable of distinguishing right from wrong with respect to that act is not accountable . . .; or

(b) A person who suffered from a condition of mind caused by mental disease or defect that prevented the person from forming a culpable mental state that is *an essential element of the crime charged* . . . .

(emphasis added). The language in subsection (1)(a) is unequivocal: A defendant need only be insane "at the time of the commission of the act." Similarly, the language in subsection (1)(b) implicitly limits the relevant

period of insanity to the time of the offense by allowing defendants to assert insanity to negate the existence of criminal mens rea, which is necessarily tethered to the time of the alleged criminal conduct. Thus, although Colorado's Criminal Code does not specifically recognize temporary insanity, the mental disease or defect underlying an insanity plea can be temporary in nature because the general insanity statute only requires that a defendant prove insanity at the time he or she committed the alleged crime. *People v. Low,* 732 P.2d 622, 626 n. 4, 632 (Colo.1987).

¶ 38 Consistent with our previous dictum in *Low,* we hold that section 16–8–101.5 contemplates *both* temporary and long-term insanity based on the statute's plain language.[9] We thus clarify the fourth difference between involuntary intoxication and insanity: Unlike involuntary intoxication, which is by definition temporary,[10] insanity can be temporary or long-term in nature. In holding that the length of insanity is immaterial so long as the defendant was insane at the time of the alleged crime and the other requirements under sections 16–8–101 to –114, are met, we clarify our dictum in *Garcia,* 113 P.3d at 782, and *Bieber v. People,* 856 P.2d 811, 817 (Colo. 1993), to the extent that it suggests otherwise.[11]

### VI. Conclusion

¶ 39 We hold that a virus is not a "substance" under section 18–1–804 as a matter of law. Therefore, the trial court abused its discretion when it found that a virus qualifies as a "substance." The trial court also abused its discretion in finding that Voth was entitled to assert the affirmative defense of involuntary intoxication at trial. We accordingly vacate the trial court's order, make the rule absolute, and direct the trial court to conduct further proceedings consistent with this opinion. Furthermore, we clarify that the affirmative defense of insanity under section 16–8–101.5 is available to a defendant who experiences a temporary bout of insanity so long as he or she was insane at the time of the alleged crime and meets the other requirements under sections 16–8–101 to –114.

---

9. Our rationale also applies to section 16–8–101 (Insanity defined—offenses committed before July 1, 1995).

10. "The General Assembly has defined intoxication as a 'disturbance' of capacities, and it is therefore 'temporary' by statutory definition."

*Garcia,* 113 P.3d at 782–83 (citing *Webster's New World College Dictionary* 399 (3rd ed. 1996)).

11. We also necessarily clarify *People v. Sommers,* 200 P.3d 1089, 1093 (Colo.App.2008), which cited the relevant dictum in *Garcia.*