23CA2108 Peo v Snider 08-07-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2108
Rio Blanco County District Court No. 09CR56
Honorable Denise K. Lynch, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jerry D. Snider,

Defendant-Appellant.

ORDER AFFIRMED

Division V
Opinion by JUDGE GROVE
Welling and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Erin Wigglesworth, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

¶ 1    Jerry D. Snider appeals the postconviction court's order denying his petition for postconviction relief without a hearing.  We affirm.

## I.    Background

¶ 2    A jury found Snider guilty of one count each of first degree murder and aggravated robbery.  The convictions were based on evidence that, sometime between the evening of July 2 and the morning of July 3, 2009, Snider struck his sleeping father in the head with a hatchet, dragged him to the floor, struck him several more times, and took his wallet.  *People v. Snider*, slip op. at 1 (Colo. App. No. 11CA2579, Apr. 21, 2016) (not published pursuant to C.A.R. 35(e)) (*Snider I*).  Snider fled the scene in Rio Blanco County but turned himself in at the Clear Creek County Sherriff's Office later in the day.  *Id.*  Thereafter, he was transferred to Denver Health Medical Center for mental health care, and later, to the Colorado Mental Health Institute at Pueblo (CMHIP) for evaluation of his competency, sanity, and mental condition.

¶ 3    Snider entered a plea of not guilty by reason of insanity (NGRI).  At trial, his attorneys advanced the theory that, at the time he killed his father, Snider "was experiencing the psychotic

symptoms of paranoid schizophrenia to the degree that he could not distinguish moral right from wrong." Rather, his "paranoid schizophrenic delusions and hallucinations made him believe that his father was part of a plot to kill" him such that it seemed he was in imminent danger of being killed by another and had to use deadly force to defend himself.

¶ 4 After the jury's verdict, the trial court adjudicated Snider an habitual criminal. For the first degree murder count, the court sentenced him to life in prison without the possibility of parole. And for the aggravated robbery count, the court imposed a consecutive forty-eight-year prison sentence. Snider appealed his convictions and sentence, and a division of this court affirmed. *Id.* The appellate mandate was issued on June 7, 2017.

¶ 5 Five years later, Snider filed a pro se postconviction motion asserting claims under both Crim. P. 35(a) and (c). Appointed counsel then filed a supplement asserting that (1) Snider's aggravated robbery sentence was not authorized by law and raised an inference of gross disproportionality; and (2) Snider's trial attorneys provided ineffective assistance. In particular, the supplement alleged that counsel performed deficiently by:

2

1. conceding that Snider's mental condition did not prevent him from forming the requisite culpable mental states because counsel called Dr. Karen Fukutaki, who, in Snider's view, was the only expert who testified that he could form such a mental state;

2. failing to properly endorse Dr. Lennart Abel as an expert, thus precluding the defense from asking Dr. Abel whether Snider was able to form the culpable mental state for first degree murder;

3. failing to ask any expert for their opinion regarding Snider's ability to form the culpable mental state for aggravated robbery and generally "disregard[ing]" the aggravated robbery charge;

4. failing to investigate and present evidence in support of an involuntary toxication defense based on medications Snider was prescribed and took as directed just before the crimes occurred;

5. failing to call Dr. Ethan Swift, the Denver Health doctor who evaluated Snider's mental health in the days immediately following his arrest; and

6. failing to effectively argue the issue of "settled insanity" in support of an instruction on how the presence of prior drug use may not in all circumstances deprive a defendant of an insanity defense.

¶ 6 After receiving the prosecution's response, the postconviction court denied the motion in a written order. The court rejected Snider's Crim. P. 35(a) claim, concluding that the aggravated robbery sentence was lawful. As to Snider's Crim. P. 35(c) claims related to aggravated robbery, the court found that (1) the claims were untimely, and he had failed to demonstrate justifiable excuse or excusable neglect for his late filing; and (2) the proportionality claim was raised and resolved in his direct appeal.[1]

¶ 7 The court then rejected Snider's claims of ineffective assistance of counsel related to his first degree murder conviction. The court concluded that counsel did not perform deficiently by failing to make a more effective argument for an instruction on "settled insanity" because settled insanity has been rejected as a

---

[1] In his reply brief, Snider concedes that his request for a second review of the proportionality of his aggravated robbery sentence has been foreclosed by the Colorado Supreme Court's recent opinion in *McDonald v. People*, 2024 CO 75.

defense in Colorado. As to the remaining ineffective assistance claims, the court determined that all of the alleged deficiencies were strategic decisions on the part of counsel. In the alternative, the court concluded that Snider was not prejudiced by any of counsel's alleged deficiencies because the evidence of his guilt was overwhelming.

## II. Crim. P. 35(a)

¶ 8 We first reject Snider's claim that his aggravated robbery sentence is illegal.

¶ 9 A sentence is illegal if it is inconsistent with the statutory sentencing scheme outlined by the legislature. *People v. Wenzinger*, 155 P.3d 415, 418 (Colo. App. 2006). Such a sentence may be corrected at any time. Crim. P. 35(a). The legality of a sentence is a question of law that we review de novo. *People v. Bassford*, 2014 COA 15, ¶ 20.

¶ 10 Snider asserts that his forty-eight-year aggravated robbery sentence does not comply with statutory requirements because the sentencing court erroneously found that "the habitual sentencing requirements preempted the requirement to sentence [him] as mandated by [section] 18-4-302(4)," C.R.S. 2024.

¶ 11 Section 18-4-302(4) states that a defendant convicted of aggravated robbery pursuant to section 18-4-302(1)(b), "shall" be sentenced "in accordance with the provisions of section 18-1.3-406," C.R.S. 2024 (the crime of violence statute). The crime of violence statute requires any person convicted of a crime of violence to be sentenced to a term of incarceration of at least the midpoint in, but not more than twice the maximum of, the presumptive range, as modified for an extraordinary risk crime. § 18-1.3-406(1)(a). Thus, a conviction under subsection (1)(b) of the aggravated robbery statute normally requires a sentence of ten to thirty-two years because aggravated robbery is a class 3 felony extraordinary risk crime with a modified presumptive range of four to sixteen years. *See* §§ 18-4-302(3), 18-1.3-401(10)(a), (b)(IX), C.R.S. 2024; *see also* § 18-1.3-401(1)(a)(V)(A), C.R.S. 2024.

¶ 12 However, when, as here, "[a] defendant is also charged and adjudged an habitual criminal, the enhanced sentencing portion of [the crime of violence] statute is preempted by the enhanced sentencing provisions of the habitual criminal statute." *People v. Pena*, 794 P.2d 1070, 1071 (Colo. App. 1990), *overruled on other grounds by Robles v. People*, 811 P.2d 804 (Colo. 1991); *accord*

*People v. Chavez*, 2020 COA 80M, ¶¶ 11-12.  Thus, in Snider's case, the trial court was required to impose a sentence of three times the maximum in the modified presumptive range — namely, forty-eight years.  *See* § 18-1.3-801(1.5), C.R.S. 2009; *see also People v. Hoefer*, 961 P.2d 563, 568 (Colo. App. 1998) (a presumptive sentencing range must be modified for enumerated extraordinary risk crimes, for purposes of subsequently applying a habitual criminal sentence multiplier).

¶ 13    Accordingly, Snider's aggravated robbery sentence is authorized by law, and the postconviction court did not err in so concluding.[2]

### III.    Crim. P. 35(c)

¶ 14    A trial court may deny a Crim. P. 35(c) motion without conducting an evidentiary hearing where the motion, the files, and the record clearly establish that the defendant is not entitled to relief.  *Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003).  Thus, a

---

[2] Snider's postconviction motion also challenged the consecutive nature of his sentences.  He abandoned this claim on appeal and, therefore, we do not address it.  *People v. Rodriguez*, 914 P.2d 230, 249 (Colo. 1996) (concluding that a defendant's failure to reassert on appeal all of the claims on which the postconviction court ruled constitutes a conscious relinquishment of those claims).

postconviction court may deny a Crim. P. 35(c) motion without a hearing if (1) the allegations are bare, conclusory, vague, or lacking in detail; (2) the allegations, even if true, do not warrant relief; or (3) the record refutes the claims. *See* Crim. P. 35(c)(3)(IV), (V); *People v. Duran*, 2015 COA 141, ¶ 9.[3]

¶ 15    Snider contends that the postconviction court erred by denying his Crim. P. 35(c) claims without a hearing. Reviewing that decision de novo, we disagree. *See People v. Cali*, 2020 CO 20, ¶ 14.

A.    Justifiable Excuse/Excusable Neglect

¶ 16    In his motion, Snider conceded that, as to his class 3 felony aggravated robbery conviction, his Crim. P. 35(c) claims were filed outside of the relevant three-year time limitation set forth in section 16-5-402(1), C.R.S. 2024. Pursuant to section 16-5-402(2)(d),

---

[3] Snider appears to argue that the postconviction court could not consider anything except "the pleadings" in denying relief under Crim. P. 35(c)(3)(V). Because, in our view, this argument was not raised until his reply brief, we need not consider it. In any event, even under Crim. P. 35(c)(3)(V), a court may deny a Rule 35(c) motion without a hearing based on its review of the motion, files, record, and pleadings. *See People v. Chipman*, 2015 COA 142, ¶¶ 21, 25 (stating this standard for summary denial of counsel's supplemental Crim. P. 35(c) motion).

however, he argued that he should be excused from the time bar because his mental health issues impacted his ability to timely file. Applying the factors set forth by our supreme court for determining justifiable excuse or excusable neglect, *People v. Wiedemer*, 852 P.2d 424, 440-42 (Colo. 1993), the postconviction court disagreed.

¶ 17    On appeal, Snider argues that the postconviction court erred by failing to hold a hearing on his allegations of justifiable excuse or excusable neglect.  In his view, the court applied an erroneous legal standard by noting that he did not file anything in support of the allegations.

¶ 18    True, to qualify for a hearing, a defendant need not provide evidentiary support for a claim of justifiable excuse or excusable neglect.  *People v. Chavez-Torres*, 2019 CO 59, ¶ 17.  Rather, he need only allege facts that, if true, would constitute justifiable excuse or excusable neglect under section 16-5-402(2)(d).  *Chavez-Torres*, ¶ 16.  Whether a defendant did so is a question of law that we review de novo.  *Id.* at ¶ 11.  We conclude that Snider did not.

¶ 19    Snider claimed that:

> (1)    circumstances or outside influences prevented a timely challenge to his aggravated robbery conviction because

he had only "recently" begun taking additional medication, which helped him to comprehend his condition and understand his legal needs;

(2) until his mental health was addressed, he had no reason to believe there were means (other than his direct appeal) to question the constitutionality of his conviction, or that his aggravated robbery conviction needed different treatment than his first degree murder conviction;

(3) while suffering from an untreated mental illness, he was not able to comprehend that his convictions might be constitutionally infirm;

(4) there were no other means of challenging his convictions; and

(5) although a significant amount of time had passed since his conviction, "the records are complete and the amount of time should have little impact on the People's ability to defend the challenge."

¶ 20 The postconviction court found that Snider's assertion that his mental health prevented him from timely filing a postconviction motion related to his aggravated robbery conviction was "bald and

10

conclusionary." It further found that the court files showed that Snider was of sufficiently sound mind to file a "well written pro se motion for reconsideration of sentence" in 2018 and a pro se motion for transcripts in 2019. In the latter motion, Snider asserted his belief that "grievous errors occurred during the penalty phase of [his] trial," and said, "Needless to say, these transcripts are essential for accuracy in filing post-conviction remedies." Both of these pleadings were filed within three years of the date that Snider's aggravated robbery conviction became final and contradict his claim that his mental health prevented him from timely investigating and pursuing postconviction relief. In any event, even if there were periods where Snider's mental health suffered, he fails to account for why he was unable to file his Crim. P. 35(c) claims during the periods he had a grasp on postconviction remedies and the need to do so. *Wiedemer*, 852 P.2d at 441 (a defendant claiming justifiable excuse or excusable neglect must account for the entire period of his delay).

¶ 21      Accordingly, we perceive no error in the postconviction court's conclusion that Snider failed to adequately allege justifiable excuse

or excusable neglect for his failure to timely file Rule 35(c) claims related to his aggravated robbery conviction.

## B. First Degree Murder Claims

¶ 22 There is no time limit for a defendant to collaterally attack a class 1 felony conviction under Crim. P. 35(c). § 16-5-402(1). Accordingly, after setting forth the applicable law and addressing one preliminary matter related to the strategic decisions of counsel, we address Snider's Rule 35(c) claims insofar as they relate to his first degree murder conviction.

### 1. The *Strickland* Standard

¶ 23 Defendants have a Sixth Amendment right to the reasonably effective assistance of trial counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Ardolino*, 69 P.3d at 76. Thus, a defendant must show that (1) trial counsel's performance was deficient; and (2) counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

¶ 24    To establish deficient performance, a defendant must show that, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. To establish prejudice, a defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. Because a defendant must show both deficient performance and prejudice, a court may deny requests for postconviction relief on the basis of either *Strickland* prong. *People v. Chipman*, 2015 COA 142, ¶ 32.

2.    The Postconviction Court's Strategy Determination

¶ 25    With the exception of Snider's "settled insanity" claim, the postconviction court relied solely on *Strickland*'s performance prong to reject Snider's claims of deficient performance, concluding that each of the acts and omissions that Snider challenged was the result of a reasonable strategic decision by the defense. We recognize that a challenged action of counsel "might be considered sound trial strategy under the circumstances of a particular case," *Ardolino*, 69 P.3d at 76, and that a court considering a claim of ineffective assistance "must indulge a strong presumption that

13

counsel's conduct falls within the wide range of reasonable professional assistance," *People v. Newmiller*, 2014 COA 84, ¶ 16. Here, however, the motion, files, and record shed virtually no light on the extent to which the identified acts and omissions of counsel were strategic choices made after reasonable investigation. *Id.* at ¶ 45. Nor did the postconviction court analyze or explain why it concluded that the alleged errors and omissions of counsel were the result of defense counsel's strategic plan for the case.

¶ 26 When it comes to determining issues of strategy, the extent of counsel's understanding of relevant issues is "peculiarly within [counsel's] personal knowledge." *Ardolino*, 69 P.3d at 78-79. Therefore, "[w]ith regard to strategic choices," trial counsel's credibility "can be particularly important and is a matter to be resolved by the postconviction court." *Id.* at 79. And "a reviewing court must examine counsel's reasons supporting" alleged strategy decisions. *Dunlap v. People*, 173 P.3d 1054, 1075 (Colo. 2007). Except for the rare situation in which the trial record reveals such information, a postconviction hearing is the most effective way to accomplish this task. Here, however, the record reveals nothing about trial counsel's subjective choices or decision making. Thus,

it was error for the court to reject Snider's deficient performance claims on the basis of strategy without examining the reasons underlying counsel's actions.

¶ 27    Nevertheless, examining each of Snider's ineffective assistance claims independent of a strategy determination, we conclude that they all fail. *See People v. Gutierrez-Vite*, 2014 COA 159, ¶ 11 ("We may affirm a trial court's ruling on grounds different than those employed by the court, so long as the record supports them.").

### 3.    Settled Insanity Jury Instruction

¶ 28    At trial, some evidence suggested that Snider may have suffered from "settled insanity," which refers to insanity "arising from the long-term use of intoxicants but separate from immediate intoxication." *Bieber v. People*, 856 P.2d 811, 815 (Colo. 1993). However, in *Bieber*, the supreme court rejected the doctrine of settled insanity as an affirmative defense. *Id.* at 818 ("[W]e determine that the 'settled insanity' doctrine conflicts with our present statutory scheme regarding insanity and self-induced intoxication.").

¶ 29    Trial counsel attempted to persuade the trial court that the supreme court had not decided whether, in evaluating an NGRI

defense, a jury may consider evidence of settled insanity in combination with evidence of insanity not attributable to a defendant's long-term use of drugs and alcohol. Counsel tendered an instruction (the combined insanity instruction) in support of this argument:

> In evaluating the affirmative defense of legal insanity, you are allowed to consider evidence of insanity attributable to the defendant's prolonged, voluntary use of drugs and alcohol in combination with evidence of insanity attributable to a mental disease or defect not attributable to the defendant's prolonged, voluntary use of drugs and alcohol.

¶ 30 The trial court denied the instruction, and the *Snider I* division concluded that the court did not err in doing so because it "was not an accurate statement of the law in Colorado." *Snider I,* slip op. at 13-14.

¶ 31 In the supplement to Snider's pro se motion, postconviction counsel argued that trial counsel failed to "effectively argue" why "the jury should have been given further instruction on how the presence of prior drug use may not in all circumstances deprive a defendant of a finding of insanity." In support of this argument, postconviction counsel pointed out that "[m]ost jurisdictions

16

disagree with Colorado and find that settled insanity is a defense," and argued that the jury was not permitted to have "the full law" on the issue.

¶ 32    Even if counsel had offered a more robust argument in favor of the settled insanity instruction, the holding in *Bieber*, which flatly rejected settled insanity as an affirmative defense, was — and remains — dispositive. Thus, we cannot say either that counsel performed deficiently by failing to more "effectively argue" the settled insanity issue, *People v. Houser*, 2020 COA 128, ¶ 37 ("[A]n attorney may perform effectively by choosing 'to maneuver within the existing law, declining to present untested or rejected legal theories.'") (citation omitted), or, given that the trial court was bound by *Bieber*, that a different or more developed argument would have resulted in the court providing the requested instruction to the jury.

### 4.    Failure to Call Dr. Swift

¶ 33    After Snider was transferred to Denver Health Medical Center, Dr. Swift, a resident in psychiatry, examined him and could not rule out diagnoses of schizophrenia, schizoaffective disorder, depression, and several other primary psychiatric disorders.

¶ 34    According to Snider's supplement, at his first trial (which ended in a mistrial), Dr. Kelly O'Brien, Snider's admitting physician, was permitted to testify about the information obtained by Dr. Swift, including observations that Snider was in a fetal position, mumbled, appeared suspicious and guarded, had difficulty staying on track, trailed off in thoughts, was illogical, exhibited poor judgment, and had symptoms consistent with acute psychosis. Dr. Swift further found that the symptoms and medication that had been prescribed to Snider were consistent with thought disorders, particularly schizophrenia. Consequently, Dr. Swift made a provisional diagnosis of psychosis not otherwise specified.

¶ 35    "The jury that convicted Snider [at his second trial]," the supplement asserted, "did not hear any of this information" because "the court deemed [Dr. O'Brien's] testimony to be hearsay" and "advised defense counsel that if they wanted the information in evidence, they could call Dr. Swift." The supplement further claimed that defense counsel performed deficiently by failing to call Dr. Swift, and that deficiency prejudiced Snider because "[t]he jury was not able to hear relevant information concerning his mental

18

health from a qualified psychiatrist at an important time," namely, in the days just after the homicide.

¶ 36    We agree with the People that the record refutes this claim. At Snider's second trial, Dr. O'Brien testified that Dr. Swift conducted a psychiatric consult on Snider. Dr. O'Brien testified that Dr. Swift noted that, when he encountered Snider, he was under a blanket in a fetal position; "appear[ed] psychotic"; mumbled and often trailed off at the end of sentences; was "guarded, paranoid, and having hallucinations"; heard voices, including voices saying that they were trying to kill him; and heard people laughing at him. Further, Dr. Fukutaki, the defense-retained expert psychiatrist, testified that Dr. Swift had diagnosed Snider with "psychotic disorder, not otherwise specified." Accordingly, because the jury indeed heard the sum and substance of the evidence Snider claims they did not, and because Snider does not specify any other testimony that Dr. Swift would have offered had he been called, the record refutes his claim of ineffective assistance.

### 5.    Culpable Mental State

¶ 37    A defendant is insane for purposes of the affirmative defense of NGRI if he (1) was "so diseased or defective in mind at the time of

19

the commission of the act as to be incapable of distinguishing right from wrong with respect to that act" or (2) suffered from a condition of mind caused by mental disease or defect that prevented him from forming a culpable mental state that is an essential element of a crime charged. § 16-8-101.5(1)(a)-(b), C.R.S. 2024.

¶ 38    Snider's supplement faulted defense counsel for conceding that he was able to form the requisite culpable mental state for murder.  Counsel did this, Snider argues, by presenting the testimony of Dr. Fukutaki, who gave "the only expert evidence at trial that Snider could form the required culpable mental state of intent."

¶ 39    As the People point out, it was the prosecution, on cross-examination, who elicited Dr. Fukutaki's opinion that Snider was able to form the requisite culpable mental state.  So we can hardly say that defense counsel conceded the issue merely by offering Dr. Fukutaki as an expert, especially when she was the only expert to contradict the prosecution's evidence that Snider was capable of distinguishing right from wrong at the time of the crime.  In any event, we reject Snider's assertion that Dr. Fukutaki was the only expert to testify that he was capable of forming the requisite mental

20

state for murder. Notwithstanding Snider's assertions to the contrary, Dr. Hal Wortzel, the forensic neuropsychiatrist tasked with evaluating Snider's sanity at CMHIP, testified that, in his opinion, Snider possessed the ability to form the culpable mental state to commit the crime of first degree murder.

¶ 40 Further, we conclude that Snider's prejudice allegations are insufficient. Snider asserted that he was prejudiced because his ability to present an NGRI defense based on an inability to form specific intent and to deliberate "was impaired" by defense counsel's decision to focus on Snider's ability to distinguish right from wrong. He asserted that this was so because significant evidence of hallucinations, paranoia, lack of sleep, and prior hospitalizations "raise[d] questions" about whether he had the mental capacity to form a conscious objective after reflection.

¶ 41 To the extent these prejudice allegations are not merely conclusory, the prosecution presented significant contrary evidence that Snider could and did form the culpable mental state of after deliberation and with intent. In addition to Dr. Wortzel's opinion, Snider's brother testified to conversations with Snider in the two months leading up to the murder. Snider told him that (1) he "had

a hatchet in the shed, and the next person that fucked with him was going to get hacked up"; (2) "sometimes I wake up and I want to . . . kill dad"; and (3) he "was going to do something that [the brother] was going to hate him for, but [the brother] wouldn't have to worry about [his] money" problems. (The brother testified that he (the brother) inherited money after his father's death.) Further, when Snider turned himself in to the Clear Creek County Sheriff, he said, "I'm wanted for murder in Rio Blanco." Upon being asked by law enforcement whether he had been "contemplating" killing his father, he said he didn't want to but had to because "people" were coming "to get" him.

¶ 42    This evidence of Snider's ability to form the culpable mental state convinces us that the result of the proceeding would not have been different but for counsel's decision to call Dr. Fukutaki.

### 6.    Failure to "Properly" Endorse Dr. Abel

¶ 43    Snider's supplement asserted that Crim. P. 16(b)(1) "requires disclosure of expert opinions by the defense to the prosecution," and that defense counsel performed deficiently by failing to disclose Dr. Abel's opinion "of whether Snider was able to form the culpable mental state of intent." In Snider's view, he was prejudiced by this

failure "because the jury was not permitted to hear evidence from an expert that the trial court found was relevant and the witness was qualified to give."

¶ 44    The motion did not, however, allege that Dr. Abel had formed such an opinion. Rather, it speculated only that "if there was such an opinion, one could not have been offered due to a lack of endorsement." Nor does the record reflect that Dr. Abel was qualified to opine on Snider's ability to form a particular culpable mental state. Rather, Dr. Abel testified that he was Snider's treating physician when Snider was admitted to CMHIP but that he was not tasked with "conduct[ing] a formal insanity evaluation on Mr. Snider."

¶ 45    Contrary to Snider's assertion, the mere fact that Dr. Abel testified about Snider's mental health and determined he "was not malingering while in the state hospital" months after the crimes does not speak to Snider's ability to act with intent or after deliberation at the time the homicide occurred. Thus, because we cannot conclude that Snider adequately alleged that counsel could have elicited such an opinion from Dr. Abel had the expert disclosure been broad enough to cover the proposed line of

23

questioning, it follows that counsel was not deficient for failing to do so.

¶ 46     We note that Snider's motion also asserted that deficiencies in counsel's endorsement of Dr. Abel prevented counsel from asking the more general question whether he had ever "seen patients present with delusions where they were able to understand that an action was generally wrong but not be able to grasp that it was morally wrong?" We recognize that the trial court did not permit this question, which Dr. Abel was likely qualified to give. But Snider's supplement did not tether counsel's inability to ask it to a reasonable probability of a different outcome. That is, he did not assert that, but for counsel's inability to ask this question, the result of a trial would have been different.

7.     Failure to Assert Involuntary Intoxication Defense

¶ 47     In his supplement, Snider claimed that counsel failed to (1) properly investigate the impact of prescribed medication he took just before the crimes occurred — namely, Ativan, Antabuse, and Cymbalta; and (2) assert an involuntary intoxication defense. Attached to the supplement was a list of both common and rare

side effects of Ativan and Cymbalta, which, Snider asserted, "trial counsel could have found through investigation."

¶ 48　　We are not persuaded that Snider's allegations of deficient performance are sufficient. A list of common and rare side effects says nothing of whether Snider actually suffered any of those side effects resulting in a lack of capacity to conform his conduct to the requirements of law. *People v. Voth*, 2013 CO 61, ¶ 19. But even if we assume, for the sake of argument, that Snider's counsel was deficient in failing to investigate and present an involuntary intoxication defense, the motion and supplement failed to allege a reasonable probability that, but for this deficiency, the result of the proceeding would have been different. Instead, the supplement asserted, Snider was prejudiced "because he was deprived of the opportunity to present a legally valid affirmative defense." Be that as it may, untethered from an outcome-determinative allegation that the result of the proceeding would have been different, this assertion fails to adequately allege *Strickland* prejudice.

## IV.　Disposition

¶ 49　　The order is affirmed.

JUDGE WELLING and JUDGE JOHNSON concur.

25